Leslie EMERSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2005–SC–000205–MR.

Supreme Court of Kentucky.

Aug. 23, 2007.

As Modified Aug. 28, 2007.

As Modified Sept. 27, 2007.

■ 

Frank William Heft, Jr., Jefferson District Public Defender, Louisville, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Gregory C. Fuchs, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

This case is on appeal from the Jefferson Circuit Court where Appellant, Leslie Emerson, was convicted of the murder of Gerry Monroe, his mother's husband. Appellant was also convicted of tampering with physical evidence. Appellant raises seven claims of error: (1) that the trial court's rulings on cause challenges were improper; (2) that Jefferson County's jury selection procedure is not compliant with administrative procedures; (3) that certain statements made by Appellant were improperly obtained by police and should have been suppressed by the trial court; (4) that the prosecution improperly bolstered testimony; (5) that parts of the testimony of James Hill were irrelevant; (6) that Appellant was denied due process when the prosecutor referred to parole in the closing argument; and (7) that failure to instruct the jury on mitigating circumstances was prejudicial. The judgment is affirmed as to the guilt phase, but reversed and remanded for a new sentencing phase.

## I. Background

Appellant's conviction arose from charges brought against him for murder, robbery, and tampering with evidence. Appellant's mother, Vicki Monroe, was tried as his co-defendant and her appeal is also before this Court. He appeals as a matter of right. Ky. Const. § 110(2)(b).

Appellant's mother, Vicki Monroe, and stepfather, Gerald Monroe, owned and operated a tavern. Appellant allegedly told his girlfriend, Amanda Crews Decker, that his mother wanted Monroe murdered, and Vicki Monroe was putting pressure on him to do something about it. This intensified in the month prior to the murder. Amanda Decker testified that Appellant's mother gave him money to find someone to do

it, but he told Amanda he was thinking of doing it himself.

A couple of months before Monroe was murdered, Appellant asked Justin Crews to obtain a gun to kill Monroe. Appellant and Crews took Crews's friend, James Hill, to a Wal–Mart where Appellant picked out a rifle and gave Hill the money to buy it.

Approximately one month later, Monroe was murdered sometime between 3:30 a.m. and 5:00 a.m. Appellant received a phone call from Crews, picked him up, and they rode around for awhile. At one point, Appellant stopped the car and Crews threw a rifle that was in the trunk over the edge of the road. As he did so, a woman drove past. She called the police and Appellant and Crews were eventually stopped. They were allowed to go after saying they had stopped to look for a missing hubcap. Around 6:00 a.m., Appellant came home and told his girlfriend that he had shot and killed Monroe and made it look like a robbery.

When interviewed by Detective Marcie Davis, Appellant initially denied involvement. He claimed that his mother wanted him to get someone to kill Monroe and that he had hired a black man to kill Monroe, and buy and dispose of the gun. Appellant was interviewed once, then voluntarily took a polygraph, then was interviewed a second time. It was during this second interview that he implicated himself in the murder and was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Prior to Appellant's trial, he moved to discharge the jury panel because the procedure employed in the jury selection process in Jefferson Circuit Court purportedly did not comply with the Administrative Procedures for the Court of Justice, Part II, Section 6(2). A hearing was held and the trial court determined that the procedures were in substantial compliance with applicable law and denied the motion to discharge the jury.

The trial court next heard Appellant's motion to suppress his confession. Detective Davis had interviewed Appellant and Appellant's brother on the same day because they had both been at the bar the morning of the murder.

At trial, James Hill testified that he purchased a gun and ammunition at the request of Justin Crews, Amanda Decker's brother. Hill later learned that the gun he purchased had been used in the murder. Over a relevancy objection, he was permitted to state he was shocked when he discovered this.

Appellant was found guilty of murder and of tampering with physical evidence. A capital sentencing hearing followed. Appellant requested that the mitigating factor of extenuation be included in the mitigation instruction. The trial court ruled there was insufficient evidence to support that mitigator, and did not include it. The court, however, concluded that the aggravator of committing murder for gain was supported by sufficient evidence, and thus the Appellant was eligible for the death penalty even though he had been acquitted of robbery. In addition to instructions on other aggravators and mitigators, the jury received instructions on the full range of applicable penalties of twenty years to death.

During the Commonwealth's closing argument in the sentencing phase, the prosecutor referred to Appellant's possible parole eligibility. Appellant's objection to these statements and subsequent motion for a mistrial were denied.

The jury fixed Appellant's punishment at life without the possibility of parole for twenty-five years and the parties agreed to a one-year concurrent sentence on the tampering charge.

## II. Analysis

### A. Cause Challenges

 Appellant's argument centers around three jurors. He argues that the trial court improperly denied his motion to strike two of them and improperly granted the Commonwealth's motion to strike the other. However, the decision of whether to excuse a juror for cause is within the sound discretion of the trial court. *Alexander v. Commonwealth,* 862 S.W.2d 856, 865 (Ky.1993). "Great deference is afforded that decision in the absence of an abuse of discretion." *Mills v. Commonwealth,* 95 S.W.3d 838, 842 (Ky.2003).

 The first juror stated on his jury questionnaire that he did not think physical abuse, parental neglect and abandonment as a child should be taken into account in deciding whether to impose imprisonment or the death penalty because he believed that what happened to a person as a child did not reflect on him as an adult. At trial, he stated he did not realize that the question referred to evidence. Upon further questioning, the juror indicated he would consider specific mitigation evidence but would not put a lot of weight on child abuse or neglect. A juror *must* be able to consider mitigating evidence. The trial court denied Appellant's motion for cause because the juror indicated he could consider mitigating evidence, even though there may have been some ambiguity in his initial answers. The trial court did not abuse its discretion in allowing that juror to remain in the jury pool.

 The second juror was asked whether he could consider a penalty of 20 years for someone he found guilty beyond a reasonable doubt of murder. His answer was "no." However, on defense voir dire, he told defense counsel that he could consider a penalty other than death if a defendant were convicted of intentional murder and robbery. The court asked for clarification and this juror explained that he was confused and thought defense counsel was asking if he could consider 20 years or less and then told the court he could consider a penalty as low as 20 years and as high as the death penalty. There is some disagreement among the parties as to whether he was truly confused. However, the fact remains that he clarified his statements and indicated an ability to consider the full range of penalties. There was no error in failing to strike him.

 The trial court struck the third juror for cause after an objection. He had responded during voir dire that he would hold the Commonwealth to a higher burden of proof than that beyond a reasonable doubt. When further questioned, he equivocated and hesitated in his response and expressed a continuing uncertainty. Specifically, he stated, "It would have to be such a strong case ... strong evidence to get to the point of no ... of reasonable doubt, but I would listen, you know." The judge could reasonably determine, in his discretion, that this juror would not follow the law. The judge's decision to strike the third juror was not an abuse of discretion and thus not error.

### B. Jury Selection Procedure

 Appellant alleges that the procedure employed by the Jefferson Circuit Court in summoning prospective jurors constitutes a substantial deviation from the procedures set forth in the Administrative Procedures for the Court of Justice and in KRS 29A.

Appellant initially complained that the Jefferson County court did not require that the juror qualification form be returned within 10 days, nor that the sheriff personally serve those failing to return the form. However, the applicable rule states that the form may also be returned "at

such other times as may be specified in the summons." Administrative Procedures for the Court of Justice, Part II, Section 6(2). The jurors in this case were instructed to bring the qualification form with them on the day they were scheduled to report. This procedure for return of the form was in compliance with the rule.

■ This Court has made it clear that it will not consider minor errors in jury selection reversible unless some prejudice is demonstrated. *Robertson v. Commonwealth*, 597 S.W.2d 864 (Ky.1980). Not having the jurors who failed to respond to the summons personally served by the sheriff is not a substantial deviation from the proper administrative procedure and did not cause any prejudice to Appellant.

Under KRS 29A.060(4), personal service is permissive. It is mandatory under Administrative Procedures for the Court of Justice, Part II, Section 6(2). The concern under either procedure, however, is to ensure that the court has enough jurors present to conduct the business of the court. In this case, 700 summonses were sent in order to obtain at least 120 prospective jurors. Had there been an insufficient number of jurors, the court could have ordered service under Administrative Procedures for the Court of Justice, Part II, Section 7(4). There was a sufficient number of jurors and the randomness of the jury pool was unaffected. There was no prejudice to Appellant. Therefore, under *Robertson*, there is no error.

### C. Interrogation

■ Appellant filed a motion to suppress statements he made to Detective Marcie Davis and others. The evidence indicates that Detective Davis set up an interview with Appellant because he had been at the murder site in the early morning hours when the murder took place. At the time, she had no information as to who had shot Gerald Monroe, and Appellant was not in custody.

During the course of the interview, Appellant agreed to take a polygraph. He went to the bathroom before the polygraph and Detective Davis told him he could leave his cell phone in the interrogation room. It was at this point that Appellant claims he no longer felt free to leave because his cell phone was in the other room.

Following the polygraph, Detective Davis interviewed Appellant a second time. He still had not been arrested. During this session, Appellant made statements that were contradictory to statements he made to the polygraph examiner. Detective Davis asked him about this discrepancy and he admitted involvement in the murder. Once he confessed, the *Miranda* rights were read.

After being read his rights, he agreed to make a statement and signed the rights waiver form. Appellant was charged with conspiracy to commit murder and agreed to show police where he had buried the gun. Once the gun was recovered, Appellant was again advised of his *Miranda* rights and gave a statement to another detective in which he admitted that he shot Monroe.

At the suppression hearing, Appellant alleged that the purpose of the police interviews was to extract an incriminating statement. However, the court ruled that Appellant was not in custody when the interviews began and could have left the police station at any time. The court also found that Detective Davis's purpose was to gather information and the motion to suppress was denied.

■ The police are required to advise a person of his *Miranda* rights "only where there has been such a restriction on a person's freedom as to render him 'in custody'." *Stansbury v. California*, 511

U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293, 298 (1994); *see also Watkins v. Commonwealth,* 105 S.W.3d 449, 451 (Ky.2003). In determining whether a person is in custody, the court "must examine all of the circumstances surrounding the interrogation," but the "relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Id.* at 324, 114 S.Ct. 1526.

Appellant alleges that a reasonable man in his position would have understood his situation to be that of a person "in custody." As evidence of this, he claims that he "knew" Davis considered him a suspect. Furthermore, during the first interview, Appellant told her he was driving his mother's Lincoln, he was with Justin Crews, and they were in another county. Appellant alleges that this was incriminating because Davis already knew that there had been a witness report that a car with that description had been stopped and investigated near the scene the morning of Monroe's murder. Additionally, Appellant thought the police knew about his disposal of the weapon.

The flaw in Appellant's argument is that his "knowledge" and suspicions are nothing more than the product of a guilty conscience. Theoretically, everything a suspect says (if he is guilty) is incriminating because he knows he is guilty. There was no hard evidence that Detective Davis "knew" of Appellant's guilt. She was aware of a report that a car matching that description had been seen in the area, but no weapon was found in an initial search of that area. She claims she asked Appellant to come in for an interview because he had been at the bar the morning Monroe was murdered and that she had no knowledge of his involvement at that point. Appellant came to the detective's office voluntarily, was not monitored, was permitted to go to the restroom alone, and was told he was not in custody. As for Appellant's phone,

it was his choice to leave it in the interrogation room. He could have gotten his phone from the interrogation room and left. There is nothing to indicate that he was in custody until the moment he admitted involvement in Monroe's murder, nor is there enough evidence to suggest that any "reasonable person" would have thought otherwise.

Appellant also alleges that Detective Davis's interrogation violated *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). There, the interrogating officer "made a conscious decision to withhold *Miranda* warnings, thus resorting to an interrogation technique that he had been taught: question first, then give the warnings, and then repeat the question 'until I get an answer that she's already provided once.'" *Id.* at 606, 124 S.Ct. at 2607. The Court found that post-*Miranda* statements obtained using this technique are invalid only where police deliberately employ the technique to circumvent the suspect's *Miranda* rights. *Id.* at 602, 124 S.Ct. at 2604.

■ Appellant's argument fails for the simple reason that Miranda rights only pertain to custodial interrogation. *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Having established that Appellant was not in custody until he confessed involvement in the murder, there was no obligation to give *Miranda* warnings until that time. Thus, there was no *Seibert* violation.

### D. Bolstering

■ Appellant's former girlfriend, Amanda Crews Decker, testified as to the financial difficulties being suffered by the Appellant around the time of the murder. Appellant had bought a television on which he was behind in payments and which was in danger of being repossessed. Defense counsel objected to the admission of a

notice from the rental store threatening repossession of the television on the basis that it was being used to improperly bolster Decker's testimony. However, the state of Appellant's finances is relevant to whether he had a motive to take money from his mother to kill Monroe.

The admission of the notice was proper. It is proof of the fact that Appellant had a reason to need money. There was no error made by the trial court.

### E. Relevancy of James Hill's Statement

■■■■ James Hill was with Appellant and Crews when they went to Wal–Mart to buy the gun. Hill was unaware of the reason behind the gun's purchase. When the prosecutor asked Hill how he reacted to the news that the gun he bought had been used in Monroe's murder, defense counsel objected on relevancy grounds. The court overruled the objection, and Hill stated that he was "shocked." Appellant now argues that Hill's testimony was irrelevant and served only to tarnish the character of Appellant by showing that he had duped his friend.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Hill's shock, or the lack thereof, is not relevant to prove that Appellant killed Monroe, and it was error to allow the testimony. However, the statement bears so little weight that there is no reasonable possibility that it affected the verdict. The error is harmless.

### F. Closing Argument Remarks

■■■ Appellant alleges that in the Commonwealth's closing argument in the penalty phase, the prosecutor referred to parole. The prosecutor's statement was as follows: "Now let's talk about if you set

the penalty at life without the possibility of parole for 25 years or any penalty less than that, he has the opportunity to be released from prison when he would be younger or right about the same age as Gerald Monroe." Defense counsel objected and moved for a mistrial, arguing that the prosecutor in effect told the jury that parole eligibility was 20 years because she linked the opportunity for Appellant to be released while he was still younger than Monroe.

This Court has previously stated that although parole eligibility information is fully admissible in a truth-in-sentencing hearing, it has no place in a death penalty hearing. *Perdue v. Commonwealth,* 916 S.W.2d 148, 164 (Ky.1996). In that case, this Court made it clear that "under no circumstances should parole eligibility enter into death penalty deliberations." *Id.*

■■■ The prosecutor's comment regarding parole was improper. However, the error is harmless. The purpose of the rule regarding references to parole in sentencing where the death penalty may be given is to avoid a result where a jury gives the death penalty because they are concerned that the convicted person may be released on parole and be out on the street. In this instance, the comment has no reasonable possibility that it affected the verdict because Appellant was given a sentence allowing exactly what the prosecutor was arguing against, not the death penalty.

### G. Jury Instructions on Mitigation

■■■ Appellant requested an instruction on the moral justification or extenuation mitigating circumstances set forth in KRS 532.025(2)(b)(4), and this request was denied by the trial court.

In all cases where the death penalty applies, the judge shall include in the instructions to the jury, any mitigating or aggravating circumstances that may be

supported by the evidence. KRS 532.025(2). There are eight statutory aggravating circumstances that may require an instruction, one of these being that the offender "has committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit." KRS 532.025(2)(a)(4). There was evidence that Appellant murdered Monroe either at his mother's request or on her behalf for money. Consequently, the jury was appropriately instructed as to the murder for gain aggravating factor. There are also eight statutory mitigating factors that may require an instruction, one of these being that "the capital offense was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct...." KRS 532.025(2)(b)(4). Defense counsel sought to have this factor included in the mitigation instruction.

Appellant stated he killed Monroe so that his mother could pay her taxes and get her license for the business. This is the basis for the Commonwealth's argument that Appellant stated no moral justification for his actions. However, though Appellant did not directly testify that he felt morally obligated to kill Monroe there was evidence that Appellant believed his mother to be trapped in a bad situation, believed that she was being abused, and that she was pressuring him to get rid of Monroe. The trial court found that the evidence did not support the requested instruction and declined to give it.

 KRS 532.025(2) makes including mitigating factors mandatory in the mitigation instruction if the evidence supports them. As long as there is "some evidence" to support the mitigation factor, then the court is required to include it. *Commonwealth v. Collins*, 821 S.W.2d 488, 491 (Ky.1992) (citing *Reed v. Commonwealth*, 738 S.W.2d 818, 823 (Ky.1987)).

More specifically, evidence was presented in this case that Appellant had previously not been close to his mother and was happy about the new relationship they were developing. Appellant told Detective Davis that the relationship between Monroe and his mother was volatile, that Monroe called her stupid and told her she was worthless. Appellant knew his mother had discovered that Monroe was cheating on her with another woman. Appellant's mother told police that Appellant wanted to protect her from abuse. Most significantly, in closing argument, the prosecutor stated, "Well, it was Vicki Monroe that said to the police, if he did it, of course she knew that he did, he did it to save her from abuse. She lied to Emerson about how badly she was being treated to make it easier for him to pull the trigger." The prosecutor in this case clearly showed how Vicki Monroe laid the groundwork for Appellant's belief that Monroe was abusing her. The evidence presented at trial, at the very least, rises to the level of "some evidence." *Id.*

A mitigation instruction was given in this case. However, the judge declined to specifically include the moral justification and extenuation mitigating factor as he was required to do under the statute. This was an abuse of his discretion and resulted in prejudice to Appellant. Although Appellant did not receive the death penalty, the jury still could have sentenced him to less, and he was entitled to have the jury consider the full penalty range with extenuation mitigation in mind. While it is possible the jury considered the mitigating evidence presented, there is simply no way of knowing. The failure to instruct on mitigation under KRS 532(2)(b)(4) was error, and Appellant's sentence must be vacated and remanded to the trial court for re-sentencing.

### III. Conclusion

For the reasons set forth herein, the judgment of the Jefferson Circuit Court as to the finding of guilt is affirmed, but the sentence is vacated and remanded to the trial court to conduct a new penalty phase allowing for consideration of extenuation in sentencing.

All sitting. LAMBERT, C.J.; CUNNINGHAM, MINTON, NOBLE and SCHRODER, JJ., concur.

SCOTT, J., concurs with the majority's analysis, except as to Part II(G), to which he dissents as he does not believe that the trial court abused its discretion in denying the extenuation instruction per KRS 532.025(2)(b)(4).