Joshua PEACHER, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

and

Nereida Allen, Appellant.

v.

Commonwealth of Kentucky, Appellee.

Nos. 2011–SC–000248–MR, 2011–SC–000254–MR.

Supreme Court of Kentucky.

Feb. 21, 2013.

David Lambertus, Tricia Frances Lister, Louisville, KY, Counsel for Appellant, Joshua Peacher.

Bruce P. Hackett, Chief Appellate Defender, Cicely Jaracz Lambert, Assistant Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant, Nereida Allen.

Jack Conway, Attorney General of Kentucky, Susan Roncarti Lenz, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Joshua Peacher and Nereida Allen appeal as a matter of right from Judgments of the Jefferson Circuit Court following a joint trial in which both were convicted of murder (Kentucky Revised Statute (KRS) 507.020), first-degree assault (KRS 508.010), and first-degree criminal abuse (KRS 508.100). These charges stemmed

from their mistreatment of Allen's two-year-old nephew, Christopher Allen, resulting in serious physical injuries and his death. The couple was also convicted of abuse-Peacher of first-degree and Allen of third-degree abuse—for their mistreatment of Allen's other two-year-old nephew, Wyatt Allen (Christopher's half-brother). For these crimes the trial court sentenced Peacher, in accord with the jury's recommendation, to consecutive terms of imprisonment with the total sentence of ninety (90) years reduced to the statutory maximum of seventy (70) years. Also in accord with the jury's recommendation, the trial court sentenced Allen to consecutive terms of imprisonment totaling forty-seven (47) years. Because of both the joint trial and the underlying facts common to both cases we have consolidated their appeals for consideration in this single opinion.

On appeal Peacher maintains that the trial court erred (1) by refusing to grant the defendants separate trials; (2) by refusing to sever the charges relating to Christopher from the charge relating to Wyatt; (3) by giving complicity jury instructions which were not supported by the evidence and which incorrectly reflected the law of complicity; (4) by failing to give jury instructions that factually distinguished the murder and assault charges relating to Christopher; (5) by denying Peacher's motion to suppress statements he made to the investigating police officers; and (6) by denying motions for mistrial when, during closing arguments, counsel for Allen and for the Commonwealth made reference to facts not in evidence. For her part, Allen likewise maintains that the trial court's jury instructions failed to distinguish the separate charges relating to Christopher. She maintains additionally that the trial court erred by denying her motion for a directed verdict

of acquittal. After careful review, we find no reversible error and affirm the trial court's Judgments.

### RELEVANT FACTS

On Monday, August 25, 2008, a case worker for Child Protective Services ordered Allen's twin sisters, Janet and Jeannette Allen, to clean and repair deplorable conditions at the home they shared in east Louisville and in the meantime to provide alternate housing for their two sons, Janet's twenty-eight month-old son, Wyatt, and Jeanette's twenty-seven month-old son, Christopher.[1] According to the social worker, at the time she visited the home and talked to the mothers both boys were active and alert, were without significant bruises or other obvious signs of injury, and appeared to be normal two-year-olds. At the sisters' request, the social worker contacted Allen, with whom Wyatt had spent most of the preceding six to eight weeks, and Allen agreed to take in the two children. Accordingly, later that afternoon Allen and her live-in boyfriend, Peacher, picked up the boys and took them to their home on Holly Park Drive in south Louisville. Not quite forty-eight hours later, at about 2:00 pm on Wednesday, August 27, EMS workers responded to a 911 call from Allen and found Christopher in Allen's bedroom unconscious and in full cardiac arrest. They took the child to nearby Sts. Mary and Elizabeth Hospital, where doctors were able to reestablish a heartbeat. The child was then, at about 3:00 pm, transported to Kosair Children's Hospital, where scans and other tests revealed that Christopher had suffered severe head injuries rendering him brain dead. He also had numerous severe injuries to his abdominal organs. At about 2:00 pm the next day, August 28, Christo-

---

1. The boys shared the same father and were thus half-brothers.

pher was removed from life support and pronounced dead.

Peacher and Allen were jointly tried in February 2011. Their pretrial motions for separate trials were denied as were their motions to sever the charges pertaining to Christopher from the one charge involving Wyatt. Peacher also moved to suppress his police statements but the trial court denied the motion, ultimately allowing the introduction of redacted statements from both defendants.

At trial, the Commonwealth's medical proof included testimony by Dr. Melissa Currie, a child abuse pediatrician. She examined Christopher not long after his arrival at Kosair and documented with photographs, which were presented to the jury, the multitude of bruises he bore literally from head to foot. Among the many bruises on Christopher's head and face, the doctor noted in particular two large bruises on either side of Christopher's neck, just below his jaw. Although the reason is not known, such bruises, according to the doctor, frequently appear on babies who have been violently shaken. Dr. Currie also noted bruises on and behind Christopher's ears, bruises difficult to inflict, she testified, because there is not much blood in those areas. According to the doctor, the bruises were therefore indicative of severe blunt force trauma to both sides of the child's head. The abdomen is another area difficult to bruise, Dr. Currie testified, because there are no bones close to the surface against which the skin can be crushed, the usual reason for a bruise. Nevertheless, Christopher's abdomen had been bruised numerous times, indicating that he had been repeatedly subjected to blunt force blows to his abdomen so severe as to crush the top of his abdomen against his spine. Dr. Currie also noted the extensive bruising to Christopher's penis, scrotum, and groin,

bruises again, in her opinion, which could only have resulted from such severe blunt force trauma as repeated kicks. Asked when the injuries to Christopher would have been inflicted, the doctor testified that unfortunately with only one exception the color of a bruise is not a reliable indicator of its age. The exception is the color yellow. According to Dr. Currie, not all bruises turn yellow, but those that do, do not do so until they are about eighteen hours-old. Since none of Christopher's myriad bruises had yellowed, the doctor thought it likely that some of them, at least, had been inflicted during the eighteen hours immediately prior to her examination at 5:00 pm, on August 27, *i.e.* sometime after about 11:00 pm on Tuesday night, August 26.

With respect to the timing of Christopher's injuries, neither the medical examiner nor the neuro-pathologist who assisted her was able to be more precise. Dr. Donna Stewart, the medical examiner, testified that the cause of Christopher's death was multiple blunt force impacts: extreme and repetitive beating. Her autopsy revealed that Christopher's brain had hemorrhaged on all sides—top, bottom, and all around—and had swelled severely. His head injuries, which included retinal bleeding, an injury often associated with babies who have been violently shaken, were surely fatal. Likely fatal as well were Christopher's numerous abdominal injuries. Virtually every organ in Christopher's *torso*, with the exception of his heart and lungs, was injured: liver, stomach, gall bladder, spleen, pancreas, intestines, and right adrenal gland. Several of those organs were torn and had hemorrhaged. Asked how long it would have taken for his injuries to render Christopher incapacitated, Dr. Stewart testified that while both the head and the abdominal injuries would have become symptomatic soon after their infliction—the possi-

ble symptoms including vomiting, thirst, lethargy, lack of appetite, and glazed eyes—she could not say in what order those injuries had been inflicted and could only say with respect to when they had been inflicted that none of them was likely to have preceded Christopher's death by more than forty-eight hours.

The medical examiner was assisted by Dr. Greg Balko, a neuropathologist, who examined samples of Christopher's brain tissue microscopically. Dr. Balko testified that in brains deprived of oxygen, as Christopher's would have been due to hemorrhaging and swelling, the brain cells, the neurons, gradually die and decompose and that it is possible, therefore, by determining the degree of cell death and decomposition, to estimate how long prior to the individual's death the brain injury occurred. According to Dr. Balko, when Christopher died, at about 2:00 pm on Thursday, August 28, 2008, and the process ceased, his brain was still in the relatively early stages of cell death and decomposition, indicating to the doctor that Christopher's brain injury had been sustained within about forty-eight hours of death, or sometime after about 2:00 pm on Tuesday afternoon, August 26. Pressed on the issue of timing by counsel for Peacher, Dr. Balko agreed that Christopher's brain injuries probably occurred within a few to several hours prior to his arrival at the hospital. Dr. Stewart concurred in that estimate, but noted that "several hours" could be as many as twenty-four. All of the medical experts agreed, in other words, that Christopher's catastrophic injuries occurred sometime after Monday afternoon, when Peacher and Allen had taken Christopher into their custody. Drs. Currie and Balko agreed moreover that some of those injuries, at least, including, according to Dr. Balko, Christopher's brain injury, likely occurred sometime after Tuesday afternoon or evening.

In addition to the medical evidence, the Commonwealth's proof included statements Peacher and Allen made to investigators Wednesday night, after Christopher had been taken to the hospital. Peacher and Allen had followed Christopher to Sts. Mary and Elizabeth Hospital, where they were approached by homicide detectives responding to reports by hospital personnel that Christopher appeared to have been abused and that he was not likely to survive. Different detectives brought the two separately to police headquarters in downtown Louisville, and there they were asked to recount how Christopher had come to be in such critical condition. The interviews took place in segments—four for Peacher and five for Allen—lasting from about twenty minutes to about an hour, with breaks between of anywhere from a couple of minutes to a couple of hours. In both cases the detectives became more accusatory as the interviews progressed, and in both cases the defendants' stories evolved from essentially blanket denials of any wrongdoing to admissions of having been rough with Christopher in the course of trying to discipline him.

Initially Peacher claimed that Christopher had come to him and Allen with numerous bruises, and he suggested that Jeannette's boyfriends could have been responsible. When told that Christopher's injuries had to be more recent than that, Peacher could provide no explanation, but he described how Christopher had vomited at about 3:00 am Wednesday morning and again at about 4:00 am, how he had been slow to get up later that morning, how he had refused anything to eat but had wanted his juice, and how he had remained lethargic throughout the rest of the morning and into the afternoon. At about 1:00 Wednesday afternoon, Peacher stated, he, Peacher, had gone to Sears to buy cough

medicine for the other child, Wyatt, and had taken Wyatt with him. While at the store he had received a phone call from Allen saying that Christopher was in distress. When he got home he found Christopher limp and barely breathing. He tried to revive him by slapping him and by splashing him with cold water, but when that did no good 911 was called. Peacher claimed that, aside from his apparent nausea, Christopher had seemed fine when Peacher left for Sears. Confronted by the detective with certain inconsistencies in his statement and with the fact that nothing he had said accounted for Christopher's critical condition, Peacher recalled that after he had vomited early Wednesday morning, Christopher, unbeknownst to Peacher, had gotten up to follow Peacher to the kitchen, had apparently slipped on a loose piece of carpeting, and had fallen down the bottom part of the stairs. Otherwise with respect to Christopher's many bruises, Peacher claimed that, wanting to potty train the child, he had spanked him a few times, slapped his hands, and rapped him with his knuckles on the head, like rapping lightly on a table. He gradually admitted that his disciplining the child had included forcing Christopher to wipe up his vomit the night before, and when told by a second detective that it might be helpful to the doctors to know whether Christopher had been shaken, he admitted that at one point on Tuesday morning Christopher had had an accident on the carpet and that frustrated he, Peacher, had snatched Christopher up by the rib cage and had slowly shaken him back and forth three times while saying, "No, don't do that." He claimed, however, that Christopher was fine afterwards, and otherwise, when asked what had happened on Wednesday that could have left Christopher in such critical condition, he said he did not know.

Allen, too, stated that Christopher had been heavily bruised when she picked him up Monday afternoon, but that she had not thought much of it because her sisters kept several dogs, which often knocked the boys over. She described Christopher as a discipline problem, as a child prone to tantrums, as "a monster," and she claimed that potty training had involved spankings, swats on the hand, time-outs in the corner, and at least one episode of having Christopher clean up a mess he made on the carpet. She stated that Christopher had had little appetite for dinner at about 8:30 Tuesday evening, which was unusual for him. Later that night, sometime after midnight, he had vomited more than once. The next morning he was hard to rouse, refused food but wanted juice, was generally listless, and had glazed eyes. About 1:00 Wednesday afternoon, Allen stated, she had lain down with Christopher on her bed and had given him some juice. Immediately he began drinking it as fast as he could. Afraid that he would make himself sick, she took the juice away from him, whereupon, according to Allen, Christopher flew into a tantrum. He climbed off the bed, screamed, flailed his arms, and then threw himself backwards, landing sharply on the back of his head. She jerked him up and told him "No," but he pitched himself backward again and again struck his head. She jerked him up a second time and tried to make him stand at attention, but this time, Allen said, his body went limp, "dead-weighted," and fell back. At that point Allen realized that something was seriously wrong. Christopher's eyes had rolled back in his head and his body felt hot. She held him in front of the fan for a couple of minutes, but he did not come around. When Christopher's breathing began to fail, Allen called Peacher for help, and not long thereafter called 911.

The detective, who, by that point, had taken Allen's statement in three separate interviews, then asked Allen to demonstrate with a teddy bear how she had tried to make Christopher stand up prior to his final collapse. On the video recording Allen is visibly irate at the continued questioning and angrily complains about having been kept so long at the police station. She brusquely laid the teddy bear on its back, grabbed it up, planted it sharply on its feet, and then let it fall backward; she then grabbed it up again, again planted it on its feet and let it fall. After that she turned away, refusing to say or do anything more. More than an hour later a second detective, the lead detective in the case, informed Allen that she was under arrest for having assaulted Christopher and that upon Christopher's death, which was certain to be soon, the charge would be changed to murder. Allen then became very tearful, and in a fifth interview, this time with the lead detective, she admitted that before Christopher became unresponsive he had fallen and she had jerked him up at least two or three times and possibly as many as six times.

Dr. Currie, the child-abuse pediatrician who documented Christopher's extensive bruising, examined Christopher's half-brother Wyatt as well. She testified that while Wyatt had not been injured as extensively as Christopher had been, he did bear a number of bruises on his forehead and a bruise on the back of one of his ears. Since the forehead is easily bruised, she said, those bruises could have been accidental and would not by themselves raise much concern. As with Christopher's, however, the bruise on Wyatt's ear was unusual and indicated that he had likely been dealt a sharp blow to the side of the head. Wyatt also had a burn on one of his thighs, which, according to Dr. Currie, was almost certainly the result of a cigarette deliberately pressed against the skin.

Asked during his interview about the burn to Wyatt's thigh, Peacher told the detective that the hot ember from his cigarette had accidentally fallen on the child and had caused the burn before Peacher could brush it away. Dr. Currie testified, however, that the burn was deeper than one would expect from such an accident and that it had the round shape and raised edges characteristic of deliberately inflicted cigarette burns.

Neither Peacher nor Allen testified, but Peacher introduced portions of the surveillance video from Sears for the Wednesday afternoon Christopher was transported to the emergency room. On the video, Peacher is seen entering the store with Wyatt in his arms, then later standing in the check-out line, receiving a cell-phone call, and then abruptly leaving the store without making his purchase. With respect to Christopher, at least, Peacher's was essentially an alibi defense. He denied having injured the child and argued that when the injuries were inflicted he was at Sears. Conversely, Allen denied having injured either child and argued that Christopher's final collapse was the effect of injuries inflicted earlier by Peacher.

## ANALYSIS

### 2011–SC–000248–MR–Joshua Peacher

I. **There Was No Error Arising From the Joint Trial and Introduction of Allen's Redacted Statement.**

On appeal, Peacher first contends that he was denied a fair trial by being tried together with Nereida Allen. The introduction at trial of Allen's statements to the investigating detectives, Peacher argues, violated his right to confront adverse witnesses and so rendered the joint trial improper. We find no error in the trial

court's decision to try the defendants jointly.

■■■ Rule of Criminal Procedure (RCr) 6.20 permits the joinder for trial of two or more defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." RCr 9.16, on the other hand, requires that trials be severed "if it appears that a defendant or the Commonwealth is or will be prejudiced" by the joinder. We review the trial court's denial of a motion to sever for abuse of discretion, *Quisenberry v. Commonwealth*, 336 S.W.3d 19 (Ky.2011), and the burden is on the appellant to show that the denial was in fact unfairly prejudicial. *Id.* We note that this Court has previously upheld the joint trial of couples accused of killing a child, *see e.g. Ratliff v. Commonwealth*, 194 S.W.3d 258 (Ky.2006); *Davis v. Commonwealth*, 967 S.W.2d 574 (Ky.1998), but those cases do not address the precise issues Peacher has raised.

■■■ As Peacher correctly notes, the United States Supreme Court has held that the Confrontation Clause of the Sixth Amendment precludes the use against a criminal defendant of testimonial hearsay statements unless the statement's maker, the declarant, testifies at trial or otherwise has been available for cross-examination by the defendant. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In a joint trial, the Confrontation Clause ban applies even to hearsay statements offered as evidence against the co-defendant declarant himself, if the declarant does not testify and if the statement either expressly or by immediate implication tends to incriminate another defendant. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). In *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), however, the Supreme Court explained that the Confrontation Clause does not rule out joint trials or the use at joint trials of non-testifying defendants' out-of-court statements or confessions, provided that the statements are redacted so as to remove express or immediately obvious inferential references to defendants other than the confessor, and provided that the jury is admonished to consider the statements as evidence against the confessor alone. Here, in full compliance with *Bruton*, *Richardson* and *Gray*, the Commonwealth redacted Allen's and Peacher's recorded statements so as to eliminate any reference either one made to the other. The Commonwealth did so in such a way that the redactions were not at all apparent. From Allen's redacted statement standing alone, the jury would have had no idea of Peacher's existence.[2]

Nevertheless, relying on our discussion in *Commonwealth v. Stone*, 291 S.W.3d 696, 701 (Ky.2009), of "the possibility of *Crawford* error despite *Bruton* compliance," Peacher contends that Allen's statements describing Christopher's condition when he got up Wednesday morning—his lack of appetite, his lethargy, his dazed appearance—tended to inculpate him, Peacher, and so were not admissible under *Crawford* absent an opportunity to cross-examine Allen. In *Stone*, the defendant was charged with having fatally stabbed a man. At trial, redacted versions of Stone's and his non-testifying co-defendants' state-

---

**2.** At trial, Peacher moved to relax the redaction requirement to the extent of allowing into evidence some of Allen's references to the fact that he, Peacher, had gone to Sears and was there when Christopher finally collapsed. Peacher, of course, does not contend that those references to him rendered the redaction of Allen's statements ineffective.

ments were introduced. When, on cross-examination of the officer who presented the redacted statements, Stone sought to raise the issue of self-defense, the Commonwealth responded on redirect by having the officer read from the redacted portion of one of the co-defendant's statements a description of the victim as backing away at the time of the fatal assault. Affirming the Court of Appeals' reversal of Stone's conviction, we held that where the codefendant's out-of-court, "backing away" statement had been introduced not against the co-defendant declarant himself, but plainly against the non-declarant defendant—Stone—*Crawford* rather than *Bruton* applied and under *Crawford* the statement should not have been admitted.

In this case, unlike in *Stone*, Allen's statement was properly introduced as evidence against Allen herself. Her description of Christopher's lethargic condition late Wednesday morning cast significant doubt on her claim that he threw a violent tantrum a short time later. Additionally, her admission that she knew Christopher was ill but nevertheless roughly and forcibly disciplined him for a "tantrum" was circumstantial evidence bearing materially on the likelihood that she had had a part in inflicting Christopher's injuries. Allen's redacted statement itself, moreover, in no way attributed Christopher's condition Wednesday morning to Peacher. Only in conjunction with the medical testimony to the effect that Christopher's vomiting, his lethargy, his lack of appetite, his unusual thirst and his dazed appearance could all have been symptoms of his serious head and abdominal injuries did Allen's description of Christopher potentially, although not necessarily, implicate Peacher.

*Richardson*, 481 U.S. at 200, 107 S.Ct. 1702, presented a similar situation. In that case, the non-testifying co-defendant's redacted statement was not, by itself, inculpatory of the defendant, but became so later in conjunction with other evidence. The U.S. Supreme Court held that notwithstanding the possibility that it might inferentially incriminate the defendant, the non-testifying co-defendant's properly redacted statement was admissible against the co-defendant himself, because in that situation an instruction admonishing the jury to limit its consideration of the co-defendant's statement to the co-defendant would adequately protect the defendant's Sixth Amendment rights. 481 U.S. at 208, 107 S.Ct. 1702. *Richardson* applies here and permits the introduction of Allen's redacted statement against Allen herself. Although under *Richardson* Peacher was entitled to have the jury admonished not to consider Allen's statement against him, he did not request an admonition, and we have held that the failure to make the request constitutes a waiver of the entitlement. *Quisenberry v. Commonwealth*, 336 S.W.3d at 28.

■■■■ Peacher's final contention with respect to this issue is that even if *Richardson* permitted the introduction at trial of Allen's redacted statement against Allen, *Richardson's* rationale was undermined during closing argument when counsel for both Allen and the Commonwealth in effect urged the jury to use Allen's description of Christopher on Wednesday morning, in conjunction with the medical testimony, in evaluating Peacher's case. Peacher's concern is a legitimate one, and indeed the Supreme Court in *Richardson* warned against the misuse against a co-defendant in closing argument of a confession introduced only against the defendant confessor. 481 U.S. at 211, 107 S.Ct. 1702. Here, however, Peacher did not object to this aspect of opposing counsels' arguments, and we are persuaded that to the extent the arguments may have been improper the impropriety did not amount to

palpable error pursuant to RCr 10.26.[3] *Brewer v. Commonwealth,* 206 S.W.3d 343 (Ky.2006) (reviewing unpreserved claim of improper closing argument for palpable error); *King v. Commonwealth,* 276 S.W.3d 270 (Ky.2009) (reviewing unpreserved claim of Confrontation Clause violation for palpable error). There is no palpable error here because in Peacher's own statements to detectives he described Christopher in much the same terms as did Allen. He admitted being the one who attended Christopher when he vomited in the very early hours of Wednesday morning, he stated that later that morning Christopher was slow to get up, that he was lethargic, that he refused food, and that he was thirsty for juice. The Commonwealth's argument and Allen's argument against Peacher that Christopher was already symptomatic by Wednesday morning were thus legitimately based on Peacher's own statements to police. The fact that counsel may to some extent have improperly bolstered those arguments by referring to additional details—such as Christopher's dazed appearance—mentioned only by Allen did not alter the arguments' basic force and did not render Peacher's trial manifestly unjust. The joint trial with Allen, in sum, does not entitle Peacher to relief.

## II. There Was No Error In Trying the Charges Pertaining to Wyatt With Those Regarding Christopher.

Peacher next contends that the trial court erred by refusing to sever the charges relating to Christopher from the charge alleging the abuse of Wyatt. RCr 6.18 allows for the joinder of offenses in separate counts of an indictment provided that the offenses are of "the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." The trial court ruled that joinder was proper under each of these rubrics since in the court's view the defendants' claims to have been engaged in the potty training and disciplining of both young boys made the acts against each not only similar but part of the same transaction and part of a common plan. The Commonwealth makes the same argument here. While we are convinced that the trial court and the Commonwealth have read RCr 6.18 too broadly in finding the separate abuse of the two young victims to be part of a single transaction or common plan, we agree that the offenses are sufficiently similar to be tried jointly, given the specific proof.

The advantages of joint trials, whether of multiple charges or multiple defendants, are obvious. Trials are costly and burdensome to courts, parties, witnesses, and victims, so the savings from resolving a matter in a single trial rather than two or more separate trials are significant. This seems especially so when the evidence for separate counts will overlap to a considerable extent. It seems wasteful to require the Commonwealth to put on the same proof multiple times, to require witnesses to attend and give the same testimony at different trials, and to require separate juries to consider substantially identical evidence. Joinder also helps assure that defendants are tried for their alleged offenses in a timely manner. A joint trial, moreover, by allowing a single jury to pass on all the charges and to hear all the evidence, minimizes the risk of inconsistent verdicts. Given these many advantages,

---

3. Palpable error requires manifest injustice. In *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006) we held that it requires a showing of the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."

RCr 6.18 provides for the liberal joinder of offenses.

■■■ Notwithstanding that liberality, however, separate offenses may not be joined indiscriminately. There must be a sufficient nexus between or among them to justify a single trial. Under RCr 6.18, as noted, that nexus may be found where the separate crimes are part of a single act or transaction, such as a robbery perpetrated as part of an attempt to flee from a foiled kidnapping, *Debruler v. Commonwealth,* 231 S.W.3d 752 (Ky.2007), or robberies and sex offenses perpetrated during an uninterrupted sequence of burglaries, *Seay v. Commonwealth,* 609 S.W.2d 128 (Ky.1980). The required nexus may also be found where the separate crimes are parts of a common scheme or plan, such as the receipt of a stolen license plate as part of a plan to rob a filling station and afterward disguise the getaway car, *Tucker v. Commonwealth,* 916 S.W.2d 181 (Ky.1996), or multiple murders and assaults as parts of an ongoing criminal syndicate, *Parker v. Commonwealth,* 291 S.W.3d 647 (Ky.2009). In these cases, the required nexus does not arise simply from the proximity of the alleged crimes in time and space, although proximity is certainly relevant, but rather from a "logical" relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan. This sort of single transaction or common scheme-or-plan nexus is lacking here. There is no indication in the indictment or in the Commonwealth's pretrial representations to the trial court that the mistreatment of either child was caused by, was motivated by, or otherwise arose from or in the course of the mistreatment of the other. They were not parts of a single transaction. Nor is there any indication that the savage beating of Christo-

pher and the striking and burning of Wyatt were separate parts of an overarching scheme or plan. The defendants' claims of wanting to potty train and to discipline both boys simply do not suggest a plan to murder and to torture or a plan of which murder and torture would be parts so as to justify, under the scheme-or-plan rubric, the joinder of those allegations.

■■■ RCr 6.18, however, also permits the joinder of offenses of the same or similar character, such as similar rapes, *Moreland v. Commonwealth,* 322 S.W.3d 66 (Ky.2010); *Edmonds v. Commonwealth,* 189 S.W.3d 558 (Ky.2006); *Cannon v. Commonwealth,* 777 S.W.2d 591 (Ky.1989); separate burglaries of the same residence and related offenses against the same victim, *Roark v. Commonwealth,* 90 S.W.3d 24, 28 (Ky.2002); or the closely proximate and similarly inflicted abuse and murder of the same child victim, *Commonwealth v. Collins,* 933 S.W.2d 811 (Ky.1996). We agree with the trial court and with the Commonwealth that the abuse of Christopher and Wyatt at the same place during the same two-day period and involving the infliction of similar bruising to the ears of both children was sufficiently similar to permit joinder under the "same or similar" offenses portion of RCr 6.18.

Even when joinder is permissible under RCr 6.18, however, if it appears that a defendant or the Commonwealth "will be prejudiced by a joinder of offenses … the court shall order separate trials of counts … or provide whatever other relief justice requires." RCr 9.16. The reasons for this rule are as clear and as compelling as the reasons for the rule allowing for joinder. A defendant is apt to be prejudiced by the joinder of offenses in any of several ways. Joinder poses the risk, for example, that the jury will infer from the mere fact of multiple charges that the defendant

has a criminal disposition and so is likely to be guilty of something. There is also the risk that the evidence of one crime will be used inappropriately as evidence of another, or that the evidence will be used cumulatively, a strong case bolstering a weak one or again as proof of the defendant's criminal disposition. Finally, there is a risk that joinder will confront the defendant with a strategic dilemma: he may have compelling reasons for wanting to testify regarding one allegation but not to testify regarding another, with the joinder precluding him from doing both. The rule requires the trial court, when requested, to guard against such prejudice if possible, such as through the use of admonitions and jury instructions, or by severing the charges if no other relief will do.

Because a certain degree of prejudice is inherent in the joinder of offenses, as it is in any indictment, this Court has explained that the "prejudice" calling for severance or other relief under RCr 9.16 is "undue prejudice," *i.e.*, prejudice that goes beyond the inherent prejudice to that which is unnecessary and unreasonable. *Romans v. Commonwealth*, 547 S.W.2d 128 (Ky. 1977). Although our rule mandates relief when such undue prejudice appears likely, we have entrusted application of the rule to the trial court's discretion, *Debruler*, 231 S.W.3d at 752 and we have many times noted that an erroneous severance ruling does not justify appellate relief unless it resulted in actual prejudice to the party opposing the ruling. *Cohron v. Commonwealth*, 306 S.W.3d 489 (Ky.2010) (*citing*

*Sherley v. Commonwealth*, 889 S.W.2d 794 (Ky.1994)).[4]

As commentators have noted, the risk of undue prejudice from joinder is particularly acute when joinder is premised on the "same or similar" offense rubric of the joinder rule. *United States v. Werner*, 620 F.2d 922 (2d Cir.1980) (noting and taking issue with some of the rule's critics); 1A Wright & Leipold, *Federal Practice and Procedure* § 143 (4th ed.2008). This is so because "same or similar" offenses raise starkly the character evidence concerns of Kentucky Rule of Evidence (KRE) 404, which generally excludes evidence of a defendant's collateral bad acts when that evidence would prove no more than the defendant's bad character or criminal disposition. *Commonwealth v. English*, 993 S.W.2d 941 (Ky. 1999). Accordingly, in assessing whether joinder resulted in undue prejudice, we have asked, with KRE 404(b) particularly in mind, "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky.2002) (*citing Price v. Commonwealth*, 31 S.W.3d 885 (Ky.2000) and *Rearick v. Commonwealth*, 858 S.W.2d 185 (Ky. 1993)). If so, then the evidentiary objections to joinder, at least, have been deemed answered. *Id. See also Keeling v. Commonwealth*, 381 S.W.3d 248, 270–72 (Ky.2012) (murder and attempted murder charges properly joined because the two

---

4. Because the trial court is usually asked, in effect, to pass on both rules simultaneously, our case law has tended to conflate misjoinder in violation of RCr 6.18 with the erroneous denial of severance under RCr 9.16 and to apply the same actual prejudice requirement to both types of error. *But see Cohron*, 306 S.W.3d at 493 (noting the distinction and citing *Sebastian v. Commonwealth*, 623 S.W.2d 880 (Ky.1981)). Construing the simi-

lar federal rules, the United States Supreme Court has held that harmless error analysis applies to both types of error, but has left open the possibility that the degree of prejudice necessary to justify relief under the two rules might not be identical. *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Whether our rules require any such distinction is a question we are not here called upon to address.

incidents would have been mutually admissible in separate trials).

 If not, if evidence of the separate offenses would not have been mutually admissible at separate trials, then we have asked further whether the jury's belief as to either offense was "substantial[ly] like[ly] ... [to have been] tainted" by inadmissible evidence of the other. *Rearick v. Commonwealth*, 858 S.W.2d at 188. Only if the defendant can show that he was thus actually prejudiced by an erroneous refusal to sever is he entitled to appellate relief. *Id. Cf. United States v. Lane*, 474 U.S. at 438, 106 S.Ct. 725 (holding that misjoinder of offenses under Feḍ. R.Crim. Proc. 8 warrants appellate relief only upon a showing of actual prejudice). In assessing prejudice under the similar federal rules, the federal courts have considered such factors as (1) the extent to which the jury is apt to have compartmentalized the evidence relating to the separate offenses, prejudice being less likely where the jury was admonished to consider the evidence and the offenses separately or would naturally have done so; (2) the strength of the evidence of the separate crimes, prejudice being unlikely where the admissible evidence of the offense is overwhelming, but more likely to the extent that weaker evidence of one offense is improperly bolstered by the spillover of strong evidence of the other offense; and (3) the extent to which evidence of the two offenses would be mutually admissible at separate trials, mutual admissibility rendering prejudice very unlikely. *Lane*, 474 U.S. at 438, 106 S.Ct. 725; *United States v. Nettles*, 476 F.3d 508 (7th Cir.2007); *United States v. Jawara*, 474 F.3d 565 (9th Cir.2007); *United States v. Carson*, 455 F.3d 336 (D.C.Cir.2006). Our case law, while not as developed as that of the federal courts, is not to the contrary. In particular, as noted above, while we have focused on mutual admissibility as an important factor in the prejudice analysis, mutual admissibility is not, by itself, determinative. *United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005). Where there is a lack of mutual admissibility, it could be that the trial court's having admonished the jury to compartmentalize the evidence sufficed to neutralize the KRE 404(b) concerns, *id.*, or, even absent such an admonition, it could be that the failure to sever, in effect a KRE 404(b) error, was harmless under our harmless error standards. *See Wiley v. Commonwealth*, 348 S.W.3d 570 (Ky. 2010) (finding KRE 404(b) error harmless in light of overwhelming admissible evidence supporting the conviction); *Anderson v. Commonwealth*, 231 S.W.3d 117 (Ky.2007) (same).

 Thus, while Peacher's offenses against the two young boys were similar enough to be joined under RCr 6.18, RCr 9.16 mandates relief if that joinder will result in undue prejudice, and here Peacher claimed exactly that sort of prejudice. The concern related not to his trial on the charge that he abused Wyatt, since even had that charge been tried separately the evidence that Peacher had deliberately harmed Christopher would have been admissible, under KRE 404(b)'s allowance of other crimes evidence to show "absence of mistake or accident," *i.e.*, the evidence concerning Christopher would have been admitted to counter Peacher's claim that the cigarette burn to Wyatt was accidental. The evidence of Wyatt's abuse, at least his cigarette burn, however, would not have been admissible in a separate trial of the alleged crimes against Christopher, since aside from what it may have said about Peacher's characteṛ, that evidence had no relevance to any material issue in the murder case. In particular, it had no relevance to the main issue in the murder case—the identity of the murderer, wheth-

er Peacher, Allen, or both of them—for we have held that to be admissible as evidence of identity a collateral crime must have been perpetrated in a manner so similar to that of the charged crime as to raise a strong inference that both were committed by the same person. *Colvard v. Commonwealth,* 309 S.W.3d 239 (Ky.2010). The alleged burning of Wyatt was not sufficiently similar to anything Peacher allegedly did to Christopher to satisfy that requirement.

While Peacher's pretrial severance motion had substance, the trial court's refusal to sever requires reversal on appeal only if it resulted in actual prejudice to Peacher, and we are convinced that it did not. Peacher was found guilty of the crimes against Christopher, having either committed them alone or in complicity with Allen. The evidence of either theory, principal or accomplice, was overwhelming. Peacher's own statement to the police indicated that he was an active participant, along with Allen, in the "disciplining" of Christopher through physical blows and shaking, and his statement in conjunction with the medical testimony made it clear that as a result of that "discipline" Christopher had suffered critical, probably fatal, internal injuries by Wednesday morning when, by Peacher's own account, the child had become symptomatic. The jury is thus not likely to have been substantially swayed in its determination of Peacher's guilt *vis-à-vis* Christopher by the evidence that Peacher also abused Wyatt. Notwithstanding the revulsion aroused by the deliberate burning of a child, in this case the jury is certain to have been so revolted by the extremely cruel and extensive injuries inflicted upon Christopher that the alleged, less serious abuse of Wyatt would have added little. Since Peacher was thus not harmed by the trial court's denial of his motion to sever, he is not entitled to relief.

As a final point before this Court, Peacher has asserted that he was prejudiced by the joinder of the charges related to the two children because he wished to testify regarding Wyatt but was inhibited from doing so because he did not want to testify regarding Christopher. This issue has not been much addressed in our cases. The federal courts, however, under their similar rules of joinder and severance, have noted that, while courts zealously guard a defendant's Fifth Amendment right not to testify at all, "the case law is less protective of a defendant's right to testify selectively." *United States v. Fenton,* 367 F.3d 14, 22 (1st Cir.2004) (citation and internal quotation marks omitted). A defendant who argues for severance on the basis of selective testimony "must make a 'persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other counts.'" *United States v. McCarther,* 596 F.3d 438, 443 (8th Cir.2010) (*quoting United States v. Possick,* 849 F.2d 332, 338 (8th Cir.1988)). The United States Circuit Court for the Sixth Circuit has held that severance is not required unless the defendant " 'makes a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other.'" *United States v. Bowker,* 372 F.3d 365, 385 (6th Cir.2004), *vacated on other grounds,* 543 U.S. 1182, 125 S.Ct. 1420, 161 L.Ed.2d 181 (2005) (*quoting United States v. Martin,* 18 F.3d 1515, 1518–19 (10th Cir.1994)). Otherwise, "severance would be available to a defendant virtually on demand." *Fenton,* 367 F.3d at 23. This Court reached a similar conclusion in *Owens v. Commonwealth,* 572 S.W.2d 415, 416 (Ky.1977):

> [Defendant] argues that he was confounded in his defense for the reason he wished to testify as to one charge, but

not the others.... This argument in the absence of other compelling factors ordinarily is not sufficient to warrant a severance. Otherwise, it would have the effect of nullifying the provisions of RCr 9.12, "consolidation of offenses for trial."

Here, not only did Peacher not make a convincing showing in the trial court of his need to testify selectively, but he did not raise the issue at all. The short paragraph he devotes to the issue in his brief before this Court, in which he asserts merely that in a separate trial of the charge related to Wyatt he "would have testified in order to elaborate on the injury to Wyatt which Appellant Peacher already admitted as an accident," comes nowhere near either "a persuasive and detailed showing" regarding the testimony he wished to give, or a showing that the joint trial amounted, with respect to this issue, to palpable error. RCr 10.26 (establishing the standard of review for unpreserved errors). In sum, there was no reversible error when Peacher was tried for the charges relating to Christopher and the charges relating to Wyatt in a single proceeding.

### III. There Was Sufficient Evidence of Complicity and to the Extent the Complicity Definition Instruction Was in Error, That Error Was Harmless Given the Substantive Offense Instructions Correctly Identified the Required Mental States.

■ In light of our discussion with respect to severance, we reject out of hand Peacher's next contention, which is that there was insufficient evidence of complicity to support the jury instructions incorporating that theory of the case. The jury found Peacher guilty of the murder of Christopher under an instruction which allowed for a guilty verdict if the jury believed beyond a reasonable doubt that Peacher caused the criminal result—Christopher's death—either "acting alone or in complicity with another." Peacher maintains that "there was not even a mere scintilla of evidence that the two co-defendants acted in complicity in the murder of Christopher Allen." By thus incorporating a theory of the case not supported by the evidence, Peacher argues, the instruction deprived him of his right to a unanimous verdict. He attempts to support this contention by asserting that "[t]here was no testimony from any source that the two co-defendants solicited each other, commanded each other, or conspired together to bring about the injuries to Christopher." To the extent that Peacher means to suggest that direct evidence of a conspiracy is required, he is mistaken. He misstates as well what constitutes complicity under our law.

■ KRS 502.020, "Liability for conduct of another—complicity," provides in pertinent part that

When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result.

KRS 502.020(2)(a)-(b). Causing a "particular result" is an element of all levels of homicide, the particular result being the victim's death. Peacher could be held liable for Christopher's death, therefore, if, with a culpable mental state, he caused Christopher's death himself or, again with a culpable mental state, he aided Allen while she engaged in conduct causing Christopher's death. The statute does not

require evidence of an express pact between the complicitors. Rather, just as the defendant's state of mind may be inferred from the circumstances, we have held that circumstantial evidence of complicity may suffice. *Commonwealth v. Combs*, 316 S.W.3d 877 (Ky.2010) (circumstantial evidence of complicity to commit drug trafficking); *Meredith v. Commonwealth*, 164 S.W.3d 500 (Ky.2005) (circumstantial evidence of complicity to commit robbery). This has been our law since before the Penal Code. *See Taylor v. Commonwealth*, 301 Ky. 109, 190 S.W.2d 1003, 1005 (1945) ("[T]he existence of a common purpose and the joint character of the undertaking may be inferred from all the circumstances accompanying the act.").

■ Here, Christopher's myriad serious injuries; the medical testimony regarding the force required to inflict those injuries; the medical testimony to the effect that critical, possibly fatal injuries had likely been inflicted by Wednesday morning, when Christopher had become symptomatic, *i.e.,* before Allen and Christopher were left alone; and Peacher's admissions to having spanked Christopher, rapped him repeatedly on the head, shaken him, and forced him to clean up his own vomit, all in the course of "disciplining" a two year-old, were evidence which, construed favorably to the Commonwealth, would permit a reasonable juror to conclude beyond a reasonable doubt that Peacher, by himself or in conjunction with Allen, who also admitted to a course of "disciplining" the child, caused or aided in causing Christopher's death. As we recently reiterated in *Combs,* " 'where evidence is sufficient to support a conviction as either an accomplice or as a principal, an instruction in the alternative is proper.' " 316 S.W.3d at 881

(quoting from *Pate v. Commonwealth,* 243 S.W.3d 327, 334–35 (Ky.2007)). The alternative instruction was proper here. *See Commonwealth v. Benham,* 816 S.W.2d 186 (Ky.1991) (discussing and applying the "reasonable juror" standard for assessing sufficiency of the evidence challenges).

■ Peacher also contends that the jury instructions were flawed by an inappropriate definition of complicity.[5] As Peacher correctly notes, this Court has construed KRS 502.020(2), the section quoted above, as the section applicable to result crimes, crimes such as murder and assault where the forbidden result of the criminal actor's conduct constitutes the offense. The statute's first section, KRS 502.020(1), on the other hand, applies, we have explained, "when the principal actor's *conduct* constitutes the criminal offense." *Tharp v. Commonwealth,* 40 S.W.3d 356, 360 (Ky.2000). That section provides in pertinent part:

A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense.

It was this KRS 502.020(1) definition of complicity that the trial court included in the jury instructions. Thus, the jury was instructed that Peacher could be found complicit in the assault and murder of Christopher if he *intended* to promote or facilitate those crimes and aided Allen in committing them. It should have been

---

**5.** It is doubtful, as the Commonwealth points out, that either Peacher or Allen, who raises a similar claim, properly preserved this allegation of error. We decline to address the preservation question, however, since even under the preserved error standard of review this issue provides neither party with grounds for relief.

instructed, under the KRS 502.020(2) definition, that he could be found complicit if he aided, etc., Allen's killing or injuring of Christopher and did so with any of the pertinent culpable mental states—intent, aggravated wantonness, wantonness, or recklessness with respect to the killing (homicide), and intent or wantonness with respect to the serious injury (assault).

The inappropriate "intent" requirement included in the complicity definition the trial court employed was countered, however, by the substantive offense instructions, which, one-by-one, specified the culpable mental states applicable to the result crimes with which Peacher was charged and asked the jury to determine whether Peacher had acted culpably and if so with what degree of culpability. It found with respect to the killing that he, alone or with Allen, had acted with aggravated wantonness, i.e., had consciously disregarded a grave risk of death and had done so under circumstances manifesting extreme indifference to human life. With respect to assault, it found that Peacher, alone or with Allen, had seriously injured the child intentionally. Clearly, since it found Peacher guilty of an unintentional killing, the jury was not confused by the trial court's slight definitional misstep, and Peacher has failed to identify how otherwise it prejudiced him.

Peacher also notes that the trial court's manner of delivering the complicity instructions—defining complicity separately and then in substantive offense instructions directing the jury to find the defendant guilty if "he alone or in complicity with another" committed the offense—has been criticized on the ground that the definition may be obviated by including in the offense instruction a description of the defendant's conduct constituting complicity. 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 10.01 (5th ed.2012). Not-withstanding this criticism, however, the trial court's approach has often been upheld. *See, e.g., Beaumont v. Commonwealth,* 295 S.W.3d 60 (Ky.2009); *Crawley v. Commonwealth,* 107 S.W.3d 197 (Ky. 2003). Because, as discussed above, the evidence adequately supported a reasonable juror's conclusion that Peacher participated directly in the brutal beating of Christopher and/or lent aid to Allen's beating of the child, the trial court's combination principal/complicitor instruction was not improper in this case.

## IV. The Jury Instructions Adequately Distinguished the Alleged Abuse of Christopher From the Alleged Murder.

Peacher next contends that the jury instructions failed to distinguish factually between the alleged assault and the alleged killing of Christopher. The pertinent instructions provided in part as follows:

### INSTRUCTION NO. 2

### MURDER (WANTON)

[Y]ou will find the defendant ... guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in this county, between the 25th day of August, 2008, and the 27th day of August, 2008, the defendant, acting alone or in complicity with another, killed Christopher Allen by inflicting blunt force trauma.

AND

(B) That in so doing, the defendant was wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of Christopher Allen under circumstances manifesting an extreme indifference to human life.

## INSTRUCTION NO. 5

### ASSAULT IN THE FIRST DEGREE (INTENTIONAL)

You will find the defendant ... guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in this county, between the 25th day of August, 2008, and the 27th day of August, 2008, the defendant, acting alone or in complicity with another, intentionally caused serious physical injury to Christopher Allen by inflicting blunt force trauma.

While both instructions referred to "inflicting blunt force trauma" there was one crucial, distinguishing element. The wanton murder instruction required a finding of blunt force trauma that resulted in "the death of Christopher Allen" while the first-degree assault instruction required blunt force trauma that "caused serious physical injury to Christopher Allen." The difference in death *vis-a-vis* serious physical injury is obvious and this Court has held accordingly that while homicide and assault are both "result offenses" they involve readily distinguishable conduct. In *Commonwealth v. Hager*, 41 S.W.3d 828, 830–31 (Ky.2001), this Court stated that "when an assault results in the victim's death, the offense is not an assault but a homicide. KRS 507.010.... 'Bodily injury is the prohibited result of the former [assault] and death is the prohibited result of the latter [homicide].'" (citation omitted). Because the challenged murder and assault instructions required different results and because there was evidence of multiple injuries inflicted upon Christopher (some fatal, others potentially fatal and others serious but not life-threatening), these instructions do not suffer from the same flaw we have highlighted in a series of recent cases.

Recently, we have held a number of times that in cases involving multiple charges of the same offense a trial court errs "if its instructions to the jury fail to factually differentiate between the separate offenses according to the evidence." *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky.2009) (citing *Combs v. Commonwealth*, 198 S.W.3d 574 (Ky.2006) and holding that instructions failing factually to distinguish among multiple counts of third-degree rape and multiple counts of sodomy were erroneous); *see also Harp v. Commonwealth*, 266 S.W.3d 813 (Ky.2008) (error to give instructions failing to distinguish among seven counts of sex abuse); *Miller v. Commonwealth*, 77 S.W.3d 566 (Ky.2002) (error to give indistinguishable instructions on multiple counts of rape and multiple counts of sodomy); *and cf. Schrimsher v. Commonwealth*, 190 S.W.3d 318 (Ky.2006) (no error to give multiple assault instructions where each was distinguished by reference to a specific, separate injury and was accompanied by a "separate act" instruction requiring the jury to find that the separate injury resulted from an act that was separate from the acts that caused the victim's other injuries). As we noted in *Miller*, " 'when multiple offenses are charged in a single indictment, the Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense.' " 283 S.W.3d at 695 (quoting from *Miller v. Commonwealth*, 77 S.W.3d at 576).

Although, as the Commonwealth notes, the issue usually arises where the defendant has been charged with multiple counts of the same offense, in *Johnson v. Commonwealth*, 864 S.W.2d 266 (Ky.1993), we reversed a conviction of sexual abuse because the instruction pertaining to that charge was not adequately distinguished

from another instruction pertaining to a charge of rape. The instructions did not make clear that the sexual abuse finding was to be based on sexual contact other than the alleged intercourse, which was the basis for the rape charge. The instructions thus permitted Johnson to be convicted of two offenses for the single act of forcibly compelled intercourse. Notably, the sexual abuse and rape offenses were both conduct crimes and the same conduct by Johnson could be used to "satisfy" both offenses of which the jury found him guilty. The situation here is unlike that in *Johnson* because, as noted, homicide and assault crimes are "result" crimes in which the jury must find the required result—death for a homicide and injury for an assault. The infliction of blunt force trauma that formed the basis of the murder charge had to result in Christopher's death while the blunt force trauma underlying the assault charge had to produce serious physical injury, *i.e.*, injuries short of death. Given the extensive medical evidence of traumatic injury to many of Christopher's organs, including his liver, stomach, gall bladder, spleen, pancreas, intestines, penis and scrotum, as well as the evidence of fatal trauma to his head causing brain hemorrhage and death, there was ample evidence of blunt force trauma injuries causing serious physical injury as well as separate blunt force trauma causing death.

Stated differently, the evidence establishes that in the approximately forty-eight hours that Christopher resided with Peacher and Allen he suffered blunt force trauma that caused his death (his head injuries resulting in brain hemorrhage) as well as other blunt force trauma that caused serious physical injury (the abdominal injuries which were potentially lethal as well as the ruptured testicle and scrotum injuries which were also serious, but apparently not life-threatening). The absence of a witness who can testify to Peacher's (and Allen's) different egregious acts over that period of time or medical testimony that can precisely sequence the resulting bodily injuries does not mean that the couple's conduct over the forty-eight hour period all merges into the murder conviction. Clearly Christopher was subjected to assaults on different parts of his body, most likely effected in different ways according to the expert testimony (some by striking, others by shaking, kicking or squeezing) and, under Kentucky law, Peacher (and Allen) can be held accountable for all of that criminal activity, not just the wanton blunt force trauma that produced death. *Cf., Kiper v. Commonwealth*, —— S.W.3d ——, 2012 WL 5877578 (Ky.2012), (drive-by shooting involving multiple shots in rapid succession could not form basis for separate attempted murder and first-degree assault convictions under KRS 505.020(*l*)(b)). The trial court's instruction allowed for that accountability for separate instances of criminal conduct by requiring the jury to distinguish between the results—a homicide conviction, at the appropriate level of culpability, for Christopher's death and an assault conviction for those serious physical injuries that did not cause his death.[6]

---

**6.** Peacher's appellate brief states generally that the trial court's instructions were deficient because there was no requirement that the jury distinguish separate and distinct acts for the different offenses. The ensuing argument, however, focuses solely on the murder and assault convictions, stating "it is quite possible that the jury convicted . . . of murder and assault based on the same single act." Peacher has not argued that the assault and criminal abuse convictions could have been based on the same act, and so we do not address that issue as we do for Allen who made that specific argument. We note that had the argument been presented and deemed meritorious given that both convictions, in

## V. Peacher Was Not Entitled to the Suppression of His Statement to Police.

 Peacher next contends that the trial court erred when it denied his motion to suppress the statements he made to the investigating detectives. Suppression was called for, he maintains, because the detectives questioned him without first advising him, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), of his constitutional rights to remain silent and to have the assistance of counsel. Following a suppression hearing, at which the two detectives who questioned Peacher testified, the trial court denied Peacher's motion because in its view Peacher was not in custody during the first three segments of his interview, and so during those segments the *Miranda* warnings were not required. The trial court further found that at the beginning of the interview's fourth segment, when arguably Peacher was taken into custody, he was properly advised of his rights and duly waived them. Peacher takes issue only with the trial court's "custody" determination.

 Under *Miranda,* of course, law enforcement officers must advise suspects of their rights to remain silent and to counsel's assistance before subjecting them to custodial interrogation. 384 U.S. at 471–72, 86 S.Ct. 1602. For *Miranda's* purposes, the Supreme Court has recently explained,

> "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, ... a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.... And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation.

*Howes v. Fields,* —— U.S. ——, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (citations and internal quotation marks omitted). Relevant circumstances include the place, time, and duration of the questioning; the questioning's tenor, whether cordial and neutral or harsh and accusatory; the individual's statements; the presence or absence of physical restraints; whether there was a threatening presence of several officers and a display of weapons or physical force; and the extent to which the questioner sought the individual's cooperation or otherwise informed him that he was not under arrest and was free to leave. *Howes v. Fields,* 132 S.Ct. at 1189–90; *United States v. Littledale,* 652 F.3d 698 (7th Cir.2011); *Cecil v. Commonwealth,* 297 S.W.3d 12 (Ky.2009).

 We review the factual findings underlying a trial court's suppression rulings for clear error, but its application of constitutional standards to those facts we review *de novo. King v. Commonwealth,* 302 S.W.3d 649 (Ky.2010). In particular, "[t]he question of 'custody' is reviewed *de novo.*" *Alkabala–Sanchez v. Commonwealth,* 255 S.W.3d 916, 920 (Ky.2008) (citing *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

Peacher's case, involved serious physical injury and intentional conduct, the vacation of Peacher's ten (10) year sentence for criminal abuse would have no real impact on his sentence, still eighty (80) years by virtue of the consecutive sentences for the murder and assault of Christopher (50 and 20 years, respectively) and abuse of Wyatt (10 years), capped at seventy (70) years pursuant to KRS 532.110.

Peacher contends that the following circumstances would have led a reasonable person to believe that he was not at liberty to terminate the interview and to leave: Peacher was not allowed to stay with Christopher at the hospital, but was taken in a police vehicle to the police station; he was kept there for nearly four hours and was questioned three times before he was *Mirandized;* the interviews were recorded; he was told that his house and his car would be searched and that his phone records would be subpoenaed; during the second interview the detective took his cell phones and read the text messages recorded on them;[7] during the third interview the questioning became more accusatory, and the detective asked him what he had in his pockets, searched his wallet, and had him photographed.

Peacher notes in particular that during the third interview, in the course of trying to impress upon Peacher the seriousness of the situation and how important it was for him to be completely truthful, the detective said, "You understand why we wouldn't let you go on to the [second] hospital?" Peacher seizes on that remark as indicating that he was, in effect, arrested at the first hospital, Sts. Mary and Elizabeth, and so was in custody during the entirety of his questioning at the police station.

At the suppression hearing, however, the detective who transported Peacher from Sts. Mary and Elizabeth Hospital to the police station and who conducted the first three segments of Peacher's interview testified that both Peacher and Allen were asked to come to the police station to be interviewed and that both agreed voluntarily to do so. Peacher was not frisked

and was in no way compelled or restrained. He rode, rather, as a passenger in the front seat of the detective's unmarked vehicle. To the extent that his remark during Peacher's interview suggested anything to the contrary, the detective testified, it was a misstatement. The trial court found that Peacher "freely went to the police station." Since there is substantial evidence to support that finding— not only the detective's testimony expressly addressing the question but other circumstances to be discussed below—we will not disturb it on review.

■■■■■ Peacher also emphasizes that during the interview he was asked many potentially incriminating questions and that some of his answers could be deemed incriminating—particularly his admission during the second segment of his interview that an ash from his cigarette had fallen on Wyatt's leg and burned it. The question, however, is not whether Peacher was interrogated, clearly he was. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (defining "interrogation" for *Miranda's* purposes). The question, rather, is whether he was in custody at the time. *Miranda* does not forbid non-custodial interrogation. *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Custody does not materialize, moreover, merely because an interviewee admits to something potentially incriminating. *Emerson v. Commonwealth,* 230 S.W.3d 563 (Ky.2007) (fact that investigators may have known that interviewee's answers to questions were false did not make further questioning custodial); *State v. Edwards,* 299 Conn. 419, 11 A.3d 116 (2011) (mere fact that interviewee implicates himself in

7. The trial judge found that the detective asked to borrow the phone during the second interview and Peacher assented. One of the text messages, in the detective's view, ap-

peared to corroborate Peacher's statement that he was not at home when the incapacitating injury occurred.

crime does not convert a non-custodial interview into a custodial one). Indeed, as noted above, the custody determination depends on the objective circumstances. What the police may know or suspect about the interviewee or even the fact that they intend to arrest him is irrelevant to that determination, unless they communicate their knowledge or intent in such a way that a reasonable person would believe himself effectively arrested. *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The questioning to which Peacher submitted was not somehow inherently custodial.

Nor was it custodial upon a consideration of the relevant circumstances. Although it is true that Peacher did not initiate the interview and that it took place at the police station, those facts alone do not indicate custody. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Cecil v. Commonwealth*, 297 S.W.3d at 15–16; *Fugett v. Commonwealth*, 250 S.W.3d 604 (Ky.2008). The fact that Peacher was questioned intermittently for a bit more than four hours and for a time was separated from his cell phone, while circumstances weighing somewhat in favor of custody, perhaps, are likewise not sufficient. *Howes v. Fields*, 132 S.Ct. at 1193 (interview that lasted between five and seven hours and continued late into the night was not custodial); *Emerson v. Commonwealth*, 230 S.W.3d at 568–69 (questioning did not become custodial when the suspect was asked to leave his phone in a separate office; had the suspect wished to leave he could have asked to have the phone returned). Moreover, Peacher's being cautioned not to lie because his home and car could be searched along with the examination of the contents of his pockets, and photographing of him for police files would not, individually or collectively, have led a reasonable person to believe himself in police custody and not free to leave.

As the trial court correctly noted, weighing against those circumstances are the facts that Peacher voluntarily accompanied the detective to the police station; that he was not searched or restrained; that he was never physically threatened; and that at the police station he was interviewed not as a suspect in a locked interview room, but rather as a witness in an open office area where, between the segments of his interview, he was sometimes left unattended and free to move about, including watching television in a separate area. Another very important circumstance is the fact that even during the third segment of the interview, when the detective's tone became somewhat more severe as he confronted Peacher with apparent inconsistencies in his statement, the detective assured Peacher at least four times that he was not under arrest. Because in these circumstances a reasonable person would have felt free to terminate the interview and to leave, they do not add up to custody under *Miranda*. *See, Howes v. Fields*, 132 S.Ct. at 1193 (five to seven hour questioning was not custodial where it took place in well-lit, average-sized conference room; interviewee was not restrained or threatened; and he was told that he could leave whenever he wanted); *State v. Edwards*, 11 A.3d at 120–29 (increasingly accusatory stationhouse questioning about the death of a child was not custodial where suspect agreed to come to the station, was not restrained, and was told that he was not under arrest and could terminate the interview); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir.2003) (state court was not unreasonable in concluding that four-hour, increasingly confrontational station-house interview was not custodial where suspect came to station voluntarily and was told he could leave if he wanted to); *Monroe v. Commonwealth*, 244 S.W.3d 69 (Ky.2008)

(segmented stationhouse interview over a few hours was not custodial where suspect agreed to accompany police to the station and at the station was not restrained but was at times left alone in unlocked office and was allowed freely to smoke, drink, and eat). *And cf. State v. Rogers,* 277 Neb. 37, 760 N.W.2d 35 (2009) (interrogation was custodial where suspect was subjected to two hours of intensely accusatory questioning in a locked examination room and was never told that she was not under arrest or that she could leave, and in fact was not allowed to leave when she asked to do so); *State v. Muntean,* 189 Vt. 50, 12 A.3d 518 (2010) (although suspect came voluntarily to police station, questioning was custodial where it took place in small, locked "polygraph" room, was highly accusatory, and was not accompanied by any assurance that the suspect was not under arrest or free to leave).

Our determination that Peacher was not in custody prior to his being *Mirandized* answers his final contention with respect to this issue as well. Peacher contends that he was subjected to the "question first, then *Mirandize*" technique disapproved by the Supreme Court in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In that case, a police officer deliberately withheld *Miranda* warnings prior to custodial interrogation, obtained an unwarned confession, gave the warnings, and then had the suspect repeat the confession so as to obtain a *"Mirandized"* version of it. The Supreme Court held that used as it was in that case to circumvent the suspect's *Miranda* rights, such a "question first" technique was invalid. As we pointed out in *Emerson,* 230 S.W.3d at 569, however, *Miranda,* and hence *Seibert,* apply only to custodial interrogations. Because Peacher's initial questioning was not custodial, it did not run afoul of either of those cases.

## VI. Peacher Was Not Entitled to a Mistrial During Closing Arguments.

■ Next, Peacher maintains that the trial court should have declared a mistrial during closing arguments when opposing counsel in two instances made reference to matters not in evidence and once misrepresented evidence that was introduced. A mistrial, of course, is an extreme remedy to be resorted to only when a fundamental defect in the proceedings has rendered a fair trial manifestly impossible. *Parker v. Commonwealth,* 291 S.W.3d at 647. We review the trial court's decision to deny a mistrial under the abuse of discretion standard. *Id.* An opposing counsel's misstep will necessitate a new trial only if it was flagrantly improper and so prejudicial as to render the trial unfair, *Barnes v. Commonwealth,* 91 S.W.3d 564 (Ky.2002); *Alexander v. Commonwealth,* 862 S.W.2d 856 (Ky.1993), *overruled on other grounds by Stringer v. Commonwealth,* 956 S.W.2d 883 (Ky.1997), or if it was objected to, was not cured by an adequate admonition, and cannot otherwise be deemed harmless. *Barnes,* 91 S.W.3d at 567–69. The incidents of which Peacher complains did not rise to these standards and so did not, and do not, necessitate a mistrial.

■ During the final segment of Peacher's police interview, the detective asked him to demonstrate with a teddy bear how, on Tuesday morning when Christopher had made a mess on the carpet, he had picked up the child and shaken him. Although that portion of Peacher's statement had been video recorded, the Commonwealth introduced into evidence only an audio recording of it. While the jury heard, therefore, Peacher's recorded description of the shaking, as well as the detective's testimony about it, it did not

see the video demonstration. During her closing argument, counsel for Allen referred to the shaking by saying to the jury, "He demonstrated; you didn't get to see, but he demonstrated," while she herself mimed the violent shaking of a child. Immediately Peacher objected and moved for a mistrial on the ground that counsel's reference to the unintroduced video recording was improper and had tainted the jury. The trial court summarily denied Peacher's motion. Peacher did not request an admonition, and Allen's counsel then resumed her argument without further reference to the video or the shaking. Peacher now contends that opposing counsel's suggestion that incriminating evidence against him had been kept from the jury rendered his trial unfair and necessitated a mistrial. We disagree.

■■■■■ Peacher is correct, of course, that counsel, although allowed wide latitude during closing arguments to comment on the evidence and to draw reasonable inferences from it, "may not argue facts that are not in evidence or reasonably inferable from the evidence." *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky.2001). Counsel's breach of that responsibility, however, is not necessarily reversible. The rule in Kentucky, rather, has long been that an admonition to the jury to disregard an improper argument "cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky.2001) (citing *Knuckles v. Commonwealth*, 261 S.W.2d 667 (Ky.1953), and *Thomas v. Commonwealth*, 196 Ky. 539, 245 S.W. 164 (1922)). This accords with the more general rule that errors curable by admonition do not necessitate a mistrial. *Bray v. Commonwealth*, 177 S.W.3d 741 (Ky.2005) (since admonition, had it been requested, would have cured improper reference to defendant's prior bad act, that reference did not necessitate a mistrial). We have recognized two sets of circumstances in which an admonition will not be presumed to have cured an improper reference to inadmissible evidence, or, as alleged here, to evidence for whatever reason not introduced for the jury's consideration: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the improper reference would be devastating to the defendant; or (2) when the reference was made without a factual basis *and* was "inflammatory" or "highly prejudicial." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003). Neither exception applies here, because, even if improper, counsel's reference to the demonstration the jury did not see was an error readily curable by admonition and one, in the context of this case, neither inflammatory nor highly prejudicial. This result is in accord with the general rule noted above that, absent flagrant misconduct, an error by opposing counsel will warrant relief only if an admonition was requested and either denied or inadequately provided, and then only if the error was not otherwise harmless. Here, because the alleged error, if any, was not flagrant, and because an admonition, had one been requested, could have cured it, the trial court did not abuse its discretion when it denied Peacher's motion for a mistrial.

■■■ The result is the same with respect to Peacher's second claim of opposing counsel's misconduct. This one involves the prosecutor. Apparently, when the detective left Peacher alone after the first segment of his interview, Peacher used his cell phone to send and receive text messages. The detective was made aware of Peacher's phone use, and that is

when he asked Peacher if he could "borrow" his phone. It so happened that Peacher was also carrying Allen's phone, and the detective took both phones and had assistants photograph all of the text messages recorded on them. The photographed messages were not introduced at trial, but the detective testified that he reviewed some of them before he questioned Peacher for the third time and the fact that some seemed flippant to him was one of the reasons he adopted a sterner manner during that third part of the interview. He testified that one message in particular, a text that read, "hee, hee, hee," indicated to him that "they"—Peacher, apparently, and whoever else was involved in the messaging—were not taking the situation seriously. Peacher did not object to that testimony, but on cross examination he elicited the fact that Peacher had been carrying Allen's phone as well as his own.

During his closing, when he was asking the jury to consider the state of mind of people who could beat a child as severely as the medical evidence indicated Christopher had been beaten, and who could deliberately burn a child as the medical evidence suggested Wyatt had been burned, the prosecutor said, "There was a point when he [Peacher] was actually texting back and forth with the child's mother. The detective got upset with him because they were laughing. Remember the 'hee, hee, hee' text?" At that point Peacher objected and moved for a mistrial. He noted that the photographs of the text messages had not been introduced into evidence and claimed that if they had been they would have shown that the "hee, hee, hee" text was from earlier in the day and had been sent from Allen's phone, not from his. The trial court summarily denied the motion, whereupon the Commonwealth's closing resumed without further reference to the text messages. Peacher

maintains that the Commonwealth's misattribution of the "hee, hee, hee" text to him rendered his trial fundamentally unfair. We are not persuaded.

The detective testified that after the first segment of his interview Peacher, as Peacher himself admitted, texted with Jeanette, Christopher's mother. The detective did not testify that the "hee, hee, hee" text was among the texts Peacher and Jeanette exchanged at that time. He only testified that the "hee, hee, hee," text was recorded on one of the phones Peacher was carrying and that it was one of the texts that made him think Peacher and the others involved did not appreciate the gravity of the situation. To the extent that the Commonwealth's closing can be construed as definitely attributing that particular text message to Peacher, it did not accurately reflect the evidence, and the Commonwealth appears to concede as much. As with the reference to the teddy bear demonstration discussed above, however, Peacher here did not request an admonition to correct the Commonwealth's misstatement. Because an admonition could have corrected any misimpression, and because the misimpression, if that is what it was, added only marginally to the point the prosecutor was making—that Christopher's extensive and catastrophic injuries reflected egregious culpability— the Commonwealth's slight misstatement does not entitle Peacher to relief. *Price v. Commonwealth*, 59 S.W.3d at 881; *Bray v. Commonwealth*, 177 S.W.3d at 741.

■ Peacher also complains that during closing argument the prosecutor misquoted him. Following their interviews, Peacher and Allen were placed under arrest by the lead detective on the case, Detective Wescott. The detective asked Peacher if he understood why he was being arrested, and he replied, "The disci-

pline was taken too far and that made it abuse." During his closing argument, the prosecutor showed the jury slides, which at one point juxtaposed pictures of Christopher as he appeared at the hospital with the statement, "I went too far," enclosed in quotation marks. While showing the slide, the prosecutor said to the jury, "What did he [Peacher] say to Detective Wescott? 'I went too far.'" Peacher contends that because that is not literally what he said, the prosecutor's slide and remark, to neither of which Peacher objected, amounted to flagrant prosecutorial abuse. As noted above, however, attorneys are allowed wide latitude during closing argument to comment upon and make reasonable inferences from the evidence. *Childers v. Commonwealth*, 332 S.W.3d 64 (Ky.2010); *Maxie v. Commonwealth*, 82 S.W.3d 860 (Ky.2002). It was not unreasonable for the prosecutor to infer that Peacher, when asked if he understood why *he* was being arrested, was referring to himself and to his own "disciplining" of the child when he said that the discipline went too far. The prosecutor's slide and remark, therefore, were not improper.

## VII. Peacher Is Not Entitled to Relief for Cumulative Error.

 Finally, Peacher contends that the cumulative effect of all the errors he alleged rendered his trial unfair. Errors which, considered separately, do not justify relief, may nevertheless require relief if in conjunction their effect was to render the defendant's trial fundamentally unfair. *Elery v. Commonwealth*, 368 S.W.3d 78 (Ky.2012). Here, the only error we have identified was the trial court's failure to sever the charges relating to Christopher from the charge relating to Wyatt, and that error was harmless. As we explained, the evidence that Peacher committed and

was complicit in the more serious offenses against Christopher was so compelling that the jury's verdicts with respect to those offenses were not apt to have been affected by the evidence about the lesser charges pertaining to Wyatt. In short, there are no errors to cumulate, just one error which itself was harmless.

## 2011–SC–000254–MR–Nereida Allen

## I. The Jury Instructions For Murder and Assault Were Distinguishable and the Verdicts Rendered for Wanton Assault But Intentional Abuse Reflect That Allen Was Not Convicted of Both Crimes Based on a Single Act.

We turn now to the allegations of error raised by Nereida Allen. Under instructions identical, aside from the names, to those given in Peacher's case, the jury found Allen guilty with respect to Christopher of wanton murder, of first-degree assault (wanton),[8] and of first-degree criminal abuse. For those offenses she was sentenced, respectively, to twenty-five (25) years, twelve (12) years, and ten (10) years, the sentences to be served consecutively, for a total sentence of forty-seven (47) years' imprisonment. With respect to Wyatt, the jury found Allen guilty of third-degree criminal abuse, for which she was sentenced to confinement for one day, that sentence to be served concurrently with the others. As did Peacher, Allen contends that the jury instructions did not adequately distinguish the alleged assault of Christopher from his murder. For the reasons discussed above, we disagree. Given the different prohibited results for murder and assault, the instructions were sufficiently distinct and did not pose the concerns raised in cases involving indistinguishable instructions for multiple counts

---

8. Peacher was found guilty of intentional first-degree assault.

of the same offenses, or in *Johnson*, where rape and sexual abuse convictions could have been based on the very same conduct.

■ Allen also contends that for the same reason, *i.e.*, insufficiently distinguished jury instructions, her conviction for having abused Christopher is likewise infirm. The pertinent first-degree abuse instruction advised the jury that it was to find Allen guilty of that offense

> if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:
>
> (A) That in this county, between the 25th day of August, 2008, and the 27th day of August, 2008, the defendant intentionally abused Christopher Allen; and
>
> (B) That the defendant thereby caused serious physical injury to Christopher Allen; and
>
> (C) That Christopher Allen was at that time twelve (12) years of age or less.

The instructions defined "abuse," in accord with KRS 508.090(1), as "the infliction of physical pain, injury, or mental injury, or the deprivation of services by a person which are necessary to maintain the health and welfare of a person." Allen argues that this instruction permitted the jury to find her guilty of both murder and abuse for the same conduct—killing Christopher—the killing satisfying both the "death" element of the murder instruction and the "serious physical injury" element of the abuse instruction. For the reasons discussed above, we disagree. The misconduct supporting the murder offense had to result in death while the misconduct underlying the criminal abuse charge had to result in something very serious but less than death, *i.e.*, serious physical injury. There was ample evidence that Christopher suffered serious injuries in addition to those that killed him.

■ To the extent Allen contends the assault and criminal abuse convictions could be improperly premised on the same conduct under the trial court's instructions, it is clear that the result of both offenses, at least when committed in the manner attributed to Allen, is serious physical injury. Thus, at first blush, the analysis that serves to distinguish the assault charge from the murder charge (the result obtained) seems to support Allen's claim that the assault and abuse instructions are flawed. However, importantly, the jury found Allen guilty of *wanton* assault: they found she alone or in complicity with Peacher wantonly engaged in conduct (the infliction of blunt force trauma) creating a grave risk of death which seriously injured Christopher under circumstances manifesting extreme indifference to the value of human life. "Wantonly" was properly defined: "A person acts wantonly with respect to a result or to a circumstance ... when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." By contrast, first-degree criminal abuse is, by definition and as provided in the jury instructions in this case, an *intentional* crime. For this offense, the jury had to find Allen herself "intentionally abused" Christopher. With a multitude of separate injuries to different organs, literally from head to toe, there were serious injuries that could be deemed wantonly inflicted and others that were intentionally inflicted by Allen. Thus, while the jury found serious physical injury as a result of both assault and criminal abuse, the differing mental states distinguish the underlying conduct. Neither of Allen's convictions is thus infirm as having been premised on the same act.

## II. There Was Sufficient Evidence to Support All of Allen's Convictions Regarding Christopher.

■ The principal thrust of Allen's appeal is that the trial court erred when it

denied her motion for a directed verdict. Her contention is that there was insufficient evidence to uphold any of her convictions. The familiar standard applicable to motions for directed verdict is as follows:

"On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."

*Mason v. Commonwealth,* 331 S.W.3d 610, 616 (Ky.2011) (quoting from *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991)). Pursuant to KRS 507.020(1)(b), the jury instructions provided that the jury was to find Allen guilty of wantonly murdering Christopher if it believed beyond a reasonable doubt that either alone or in complicity with Peacher she caused Christopher's death, and that in so doing, under circumstances manifesting extreme indifference to human life, she wantonly engaged in conduct which created a grave risk of death. Allen insists that she did not cause Christopher's death, either alone or in complicity with Peacher, and that no reasonable juror could have found otherwise. We disagree.

Construed favorably to the Commonwealth, the evidence permitted a reasonable juror to conclude that while Allen was alone with Christopher after Peacher had gone to Sears, Christopher suffered severe head injuries certain to have been fatal. The shaking and blunt force trauma which, according to the medical evidence, were likely to have caused those injuries, could reasonably be thought to have been inflicted by Allen when, according to her own police statement, she became irate with Christopher and numerous times jerked him up and "witnessed" him falling and his head striking the floor.

Allen insists that the jury could only have found that Christopher's head injuries necessarily occurred before her time alone with Christopher, but that insistence is not borne out by the medical testimony. The examining doctors all agreed that Christopher's injuries could not have been more than about forty-eight hours old at the time of his death, which occurred about twenty-four hours after he arrived at the hospital. None of them testified, however, that any of his injuries had to have been at least a specific number of hours old, *i.e.,* had to have occurred before Peacher left the residence. Allen notes that Dr. Stewart, the medical examiner, and Dr. Balko, the brain pathologist, agreed that Christopher's brain injury probably occurred within "a few to several hours" prior to his presentation at the hospital, but they did not testify, as Allen would have it, that the brain injury was at least "a few" hours old at that point. Their testimony, rather, was that the injury was not more than a few to several hours old, and from that testimony, together with the rest of the evidence, particularly Allen's statements to the effect that Christopher could still walk and drink juice when Peacher left him alone with her and went to Sears, a reasonable juror could conclude that Allen wantonly and in circumstances manifesting an extreme indifference to the value of Christopher's life

inflicted the catastrophic head injuries.[9]

A reasonable juror could also have concluded that Allen was complicit in Peacher's fatal mistreatment of the child. The evidence that Christopher was exhibiting symptoms of internal abdominal injury by the very early hours of Wednesday morning, when he vomited, makes reasonable an inference that some of those injuries, at least, had been inflicted by that time. The hospital photographs of Christopher's numerous bruises and the medical testimony about the extreme force required to inflict many of them made it reasonable to infer that regardless of who inflicted the abdominal injuries both. Allen and Peacher were aware of the mistreatment. Thus, even if a reasonable juror believed that Peacher and not Allen inflicted the abdominal injuries—injuries, according to the medical examiner, likely to have been ultimately fatal independently of the head injuries—that juror could also believe that Allen not only acquiesced in the horrific mistreatment of the child, but lent it aid, by, as she told the police investigators, participating in his "discipline."

In arguing that the evidence did not support a complicity finding, Allen also raises the same jury-instruction issue that Peacher did. As discussed above, the jury instructions included an inappropriate definition of complicity, a definition appropriate where the complicitor has been charged with intentionally promoting or facilitating criminal conduct, whereas here Allen was charged with having acted culpably, but not necessarily intentionally, with respect to Christopher's death while aiding another whose conduct caused the death. *Tharp*, 40 S.W.3d at 356–60. Mak-

ing the mirror image of Peacher's argument, Allen contends that there was no evidence that she intended for Peacher to kill Christopher, and so, under the instructions as given, she could not be found to have been complicit in the killing. As we noted when addressing Peacher's similar claim, however, the substantive offense instructions made clear to the jury the sort of complicity alleged against Allen, and so we are not persuaded that the trial court's miscue in the separate definition of complicity resulted in any prejudice to Allen or provides her with any ground for relief.

■ Allen also contends that her convictions for having assaulted and abused Christopher were not supported by sufficient evidence. We find no merit in this claim. She was convicted of both offenses under instructions that included as an element that the victim, Christopher, suffered a serious physical injury. The medical evidence was that Christopher suffered numerous physical injuries that could reasonably be deemed serious: brain injuries, ruptures or tears to at least seven of his abdominal organs, and a ruptured testicle. The medical evidence concerning the force required to inflict those injuries, the obviously battered state of Christopher's body, and Allen's police statement in which she admitted at least one episode of rage against Christopher and other instances of "discipline" were sufficient to permit a reasonable juror to conclude that (1) Allen intentionally abused Christopher and in so doing seriously injured him, and that (2 and 3) she murdered and assaulted him, either directly or by lending aid to Peacher, by wantonly, under circumstances man-

---

9. Allen also refers us to testimony by Dr. Currie, who made the photographs of Christopher at the hospital, testimony ostensibly to the effect that the injuries to Christopher's groin and buttocks had to have been inflicted by noon Wednesday, before Allen was left alone with the child. Even if that had been Dr. Currie's testimony, which we do not agree it was, it would not rule out Allen's having inflicted the head injuries after Peacher left for Sears.

ifesting an extreme indifference to the value of human life, causing both his death and a separate serious injury. This is so even if the several serious abdominal injuries be deemed indistinguishable, because the brain injury and the ruptured testicle could reasonably be deemed additional separate injuries which Allen either caused or was complicit in causing.

Against this conclusion, Allen maintains that her police statement provides no direct evidence that she inflicted any injuries upon Christopher. The jury, however, was not obliged to take Allen's police statement at face value, *Potts v. Commonwealth,* 172 S.W.3d 345 (Ky.2005) (questions of witness credibility generally reserved for the finder of fact), and was free to infer Allen's guilt from the circumstantial evidence, particularly the evidence of Christopher's extensive and obvious injuries and Allen's admissions that she jerked Christopher several times (possibly as many as six times) and each time saw him strike his head against the floor, and that she participated otherwise in his "discipline." *Dillingham v. Commonwealth,* 995 S.W.2d 377 (Ky.1999) (noting that circumstantial evidence can be sufficient).

### III. There Was Sufficient Evidence of Allen's Abuse of Wyatt.

 Finally, Allen contends that her conviction for having abused her other nephew, Wyatt, was not supported by the evidence. With respect to Wyatt, the jury found Allen guilty of third-degree abuse pursuant to an instruction calling for a guilty verdict if, and only if, the jury

believed beyond a reasonable doubt

(A) that ... [Allen] recklessly abused Wyatt Allen; and

(B) That the defendant thereby caused Wyatt Allen to be subjected to (1) Torture; or (2) Cruel Punishment; and

(C) That Wyatt Allen was at that time twelve (12) years of age or less.

*See* KRS 508.120(1)(c). In accord with KRS 508.090(1), the instructions defined "abuse" as, in pertinent part, "the infliction of physical pain, injury, or mental injury." Allen contends that there was no evidence that she inflicted pain or injury upon Wyatt, and thus that there was no basis for a finding that she abused him. In addition to the cigarette burn on Wyatt's leg, Dr. Currie photographed and testified about numerous bruises on Wyatt's forehead and a bruise to the back of Wyatt's right ear. Dr. Currie testified that accidental forehead bruises are fairly common on toddlers and thus that Wyatt's forehead bruises, *by themselves,* would not necessarily be indicative of abuse. The bruise to Wyatt's ear, however, and what the doctor believed was a deliberate cigarette burn strongly suggested abuse, and so that cast the forehead bruises in a far more suspicious light. Tending to confirm that suspicion, Allen, near the end of her final statement to Detective Wescott, expressed disbelief that Christopher could be so seriously injured, because "the same type of thing" had been done to Wyatt "all the time." Here again then, notwithstanding the arguable lack of direct evidence of guilt in Allen's police statements and even assuming that Peacher was the one who inflicted the cigarette burn, a reasonable juror could infer from the circumstantial evidence that Allen had recklessly inflicted pain and injury upon Wyatt that amounted to torture and/or to cruel punishment. *Mason v. Commonwealth,* 331 S.W.3d at 621–23, (holding that, for the purposes of the abuse statutes, significant bruising can be sufficient evidence of "torture" or "cruel punishment").

### CONCLUSION

In sum, both defendants received a fundamentally fair trial. Peacher is not enti-

tled to relief because he was tried jointly with Allen, because the charges related to Christopher were tried together with the charge related to Wyatt, because the trial court refused to suppress the statements he made to the investigators, or because of opposing counsels' closing arguments. Neither defendant is entitled to relief because the trial court erred slightly in defining complicity for the jury. Also, neither Peacher nor Allen was prejudiced by the jury instructions pertaining to murder and first-degree assault of Christopher. Allen, finally, was not entitled to a directed verdict or to the dismissal of any of the charges against her. Neither her first-degree wanton assault conviction nor her first-degree intentional criminal abuse conviction is infirm as having been based on the same conduct. Accordingly, we affirm the Judgments of the Jefferson Circuit Court in both cases, 2011–SC–000248–MR (Peacher) and 2011–SC–000254–MR (Allen).

MINTON, C.J.; CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. All concur.