# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: AUGUST 24, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0552-MR

ANTHONY STALCUP                                                                    APPELLANT

v.                  ON APPEAL FROM MCCRACKEN CIRCUIT COURT
                    HONORABLE TIMOTHY KALTENBACH, JUDGE
                    NO. 19-CR-00679

COMMONWEALTH OF KENTUCKY                                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Appellant Anthony Stalcup (Stalcup) shot and killed Judy Stalcup (Judy) in July 2019. When the police interviewed Stalcup, he initially stated that Judy had shot herself, but later stated that he accidentally shot Judy. A grand jury indicted Stalcup for murder and possession of a handgun by a convicted felon. Stalcup went to trial on the murder charge and a jury found him guilty.[1] After Stalcup entered a guilty plea to being a convicted felon in possession of a handgun, the trial court sentenced Stalcup to a total of forty-three (43) years in prison. The single issue on appeal is whether the trial court erred by only

---

[1] The charge of being a convicted felon in possession of a handgun was severed, to be tried in the second phase of the trial. Stalcup entered an open plea to the possession charge after the jury began deliberating whether he was guilty of committing murder.

partially granting Stalcup's motion to suppress statements made to the police. Upon review, we affirm the trial court's suppression order.

## FACTUAL AND PROCEDURAL BACKGROUND

Stalcup and Judy, his ex-wife, lived together in Paducah. Aileen and Edwin were their next-door neighbors. Cody was another neighbor. On July 9, 2019, the day before Judy was killed, Judy told Aileen that she was leaving Stalcup again. According to Cody, on that same day, Stalcup came to his house to "cool off." Stalcup told Cody that he and Judy had gotten into a fight and that he had a gun, "but he didn't want to go there." Stalcup talked with Cody a little longer and then went home. Cody testified that Stalcup looked intoxicated and smelled of alcohol.

The next day, Stalcup called Edwin and said he shot Judy. Aileen and Edwin went to the Stalcup residence. When Aileen and Edwin arrived, Judy was slumped over in a recliner. Stalcup was sitting on the couch facing the victim, saying, "What am I going to do?" Aileen detected a faint pulse and called 911. McCracken County Sheriff officers and detectives responded to the scene and investigated the shooting.

When Sergeant Ray arrived at the scene, Stalcup was sitting on the couch talking on the phone. Sergeant Ray observed that the victim was shot under her right arm and detected a faint pulse. Stalcup smelled of alcohol and was unsteady on his feet when he was ordered to get up and to leave the residence. Stalcup told Sergeant Ray that the victim had shot herself and he didn't know where the gun was. Pursuant to a warrant, the home was

2

searched, and two handguns were located. One of the handguns was found where Stalcup had been sitting and was wrapped in a towel.

Detective Norman also responded to the 911 call for a possible self-inflicted gunshot wound. After the paramedics removed the victim from the home, Detective Norman asked Stalcup if he would go to the office for an interview. Stalcup said he would. Because Stalcup had been drinking, a deputy gave Stalcup a ride to the sheriff's office.

During the first hour of the interview, Stalcup claimed that the victim shot herself. During the second hour, after being read his *Miranda*[2] rights, Stalcup admitted to shooting the gun but claimed he accidentally shot the victim. In this vein, Stalcup first stated that he was lying on the couch with a pillow under his head, that the gun was under it, and that he was trying to kill himself. However, he later stated that he was trying to scare the victim and that he didn't think the bullet would hit Judy, even though she was sitting a foot away. Stalcup told Detective Norman where he placed the gun after he shot Judy.

Stalcup moved pretrial to suppress all statements he made to police on or about July 10, 2019, the day of his arrest. The trial court granted Stalcup's motion in part. While Stalcup argued that his Fifth Amendment rights against compelled self-incrimination were violated throughout the whole interview, the

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

trial court concluded that Stalcup was not in custody until Detective Norman read Stalcup his *Miranda* rights, which was about an hour into the three-hour interview. However, after being *Mirandized*, Stalcup continued the interview for another hour before requesting an attorney.[3] The trial court suppressed incriminating statements made by Stalcup after he invoked his right to counsel.

At trial, Detective Norman testified about the interview. In addition to testifying about Stalcup's inconsistent statements about the shooting, Detective Norman testified about Stalcup's description of his arguments with Judy leading up to the shooting, the reason Stalcup provided for not rendering aid to Judy although he appeared aware of the severity of the injury, and Stalcup's description of his positioning on the couch with the gun.

Detective Coffman also testified at trial. During the investigation, Detective Coffman collected a hollow point bullet at the victim's autopsy. Detective Coffman found fibers at the end of the bullet. The fibers were consistent with a pillow found in Stalcup's residence. That pillow had a hole consistent with a bullet and other tears, markings, and soot consistent with that from a discharged firearm. The investigators charted the direction of the bullet using a dowel rod and concluded that Stalcup had pointed the gun at the victim at close range.

---

[3] Stalcup's appeal does not challenge the waiver of his *Miranda* rights.

4

Stalcup was charged with and subsequently indicted for committing murder and possession of a handgun by a convicted felon. Stalcup was tried on the murder charge first. The jury returned a guilty verdict and recommended that Stalcup serve thirty-five years in prison.[4] Rather than going to trial on the possession of a handgun by a convicted felon charge, Stalcup entered a guilty plea. The trial court imposed a prison sentence totaling forty-three years, thirty-five years for committing murder and a consecutive eight years for possession of a handgun by a convicted felon. This appeal followed.

## ANALYSIS

Stalcup challenges the trial court's ruling that only part of Stalcup's statement to police was taken in violation of the Fifth Amendment. His argument has two parts. First, Stalcup argues that a closer analysis of the totality of the circumstances indicates that he was in custody and should have been advised of his rights earlier. In particular, he claims he was subjected to custodial interrogation from the moment questioning began. Second, he claims the detective used the "question first" technique during interrogation to circumvent *Miranda*, a technique prohibited by *Missouri v. Seibert*.[5]

When reviewing on appeal a trial court's order denying suppression of evidence, the factual findings are reviewed for clear error, meaning that the

---

[4] The jury was also instructed on first-degree manslaughter, second-degree manslaughter, reckless homicide, and voluntary intoxication.

[5] 542 U.S. 600, 617 (2004).

5

trial court's findings of fact will be conclusive if they are supported by substantial evidence.[6] When the factual findings are supported by substantial evidence, the next question, subject to a de novo review, is whether the law was properly applied to the established facts.[7]

The trial court's order with findings of fact and conclusions of law is thorough. The trial court's factual findings include that "[a]fter asking Stalcup . . . to exit the residence, an officer grabbed Stalcup by the arm and pulled him to the door, causing Stalcup to fall to the ground," and that "[o]n the way to the sheriff's office, the officer apologized to Stalcup for pulling him to the ground, explaining their concern for officer safety and quickly attending to the victim. On the body cam video, the officer and Stalcup can be seen shaking hands before heading into the sheriff's office." Also in relation to the circumstances at the residence, the trial court found that "Stalcup was asked to come to the sheriff's office to be interviewed about the incident and he agreed. Because Stalcup had been drinking, Stalcup accepted a ride from the officers." The trial court further found that Detective Norman informed Stalcup at some point prior to the interview that he was free to leave and that Stalcup was told prior to the interview that he was not under arrest. The trial court also found that the interview took place in a small, windowless room; Stalcup was asked to sit against the back wall of the interview room; Detective Norman sat between Stalcup and the door; Stalcup was not restrained and went to the restroom

---

[6] *Davis v. Commonwealth*, 484 S.W.3d 288, 290 (Ky. 2016) (citations omitted).

[7] *Id.* (citations omitted).

unaccompanied several times during the interview; and Detective Norman testified that the door remained open when he was not in the room.

Because Stalcup does not challenge the trial court's findings of fact as being unsupported by substantial evidence[8] and we conclude upon review that Detective Norman's testimony during the suppression heading, the recorded interview, and officer body camera video[9] is substantial evidence supporting the findings of facts, we turn to Stalcup's argument that the trial court erred as a matter of law in concluding that he was not in custody until he was read the *Miranda* warning.

The trial court found that there was a show of physical force by the officers when Stalcup was pulled to the ground at his residence, and as a

---

[8] With regard to the findings of fact, Stalcup complains that the trial court should have made other factual findings supportive of a conclusion that he was in custody earlier than the trial court concluded. For example, while the trial court found that Stalcup went to the restroom unaccompanied several times during the interview, Stalcup points out that while waiting for the interview to begin, he asked permission to use the restroom from someone outside the room. He asserts this request for permission to use the restroom indicates that he did not subjectively believe he was free to leave, and while not the focus of the inquiry, under *Commonwealth v. Lucas*, 195 S.W.3d 403, 406 (Ky. 2006), his subjective belief is relevant to a custody determination.

[9] Stalcup's appellate arguments rely in part on the findings of fact and conclusions of law related to the officers' actions at Stalcup's residence and prior to entering the sheriff's office for the interview. These actions were recorded on the officers' body cameras. However, the body camera video is not part of the record on appeal; unlike the video of Detective Norman's interview of Stalcup, appellate counsel did not move this Court to supplement the record on appeal with body camera video. While appellate counsel makes arguments related to the officer's show of force at his residence, Stalcup does not argue that the trial court's related factual findings were not supported by substantial evidence. Thus, even though the officers' body cam video is not part of the record on appeal, we view the trial court's findings of fact as conclusive. *See Coleman v. Commonwealth,* 100 S.W.3d 745 (Ky. 2002), *overruled on other grounds by Bratcher v. Commonwealth*, 424 S.W.3d 411 (Ky. 2014).

7

matter of law, considered this factor when determining whether Stalcup was in custody at the time of the interrogation. The trial court also concluded that the interaction which followed between Stalcup and the officer, the officer apologizing to Stalcup and shaking his hand, tempered any semblance of custody from the previous interaction. Stalcup argues, however, that based upon the officers' actions, he was always in custody for *Miranda* purposes.

It is fundamental that the "Fifth Amendment privilege is not violated by even the most damning admissions" unless the admissions are a result of some official coercion,[10] that the *Miranda* warning is intended to protect against inherent coercive custodial interrogation,[11] and that "*Miranda* warnings are required only where there has been . . . a restriction on the freedom of an individual as to render him in custody."[12]

> Custodial interrogation has been defined as questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of freedom of action in any significant way. . . . The inquiry for making a custodial determination is whether the person was under formal arrest or whether there was a restraint of his freedom or whether there was a restraint on freedom of movement to the degree associated with formal arrest.[13]

Stalcup cites *Smith v. Commonwealth*[14] and *Howes v. Fields*,[15] in support of his argument that he was in custody from the point of the officer's show of

---

[10] *Smith v. Commonwealth*, 312 S.W.3d 353, 358 (Ky. 2010) (quoting *Oregon v. Elstad,* 470 U.S. 298 (1985)).

[11] *Id.* (citing *Michigan v. Mosley,* 423 U.S. 96 (1975)).

[12] *Id.* (quoting *Lucas*, 195 S.W.3d at 405).

[13] *Id.* (citations and internal quotation marks omitted).

[14] *Id.*

[15] 565 U.S. 499, 515 (2012).

force.  Stalcup relies on *Smith'*s statement that "[c]ustody does not occur until police, by some form of physical force or show of authority, have restrained the liberty of an individual,"[16] to argue that such physical force occurred when the officer removed Stalcup from his residence and consequently he was always in custody.  *Smith*, however, further explains that when determining whether an individual is in custody, "[t]he test is whether, considering the surrounding circumstances, a reasonable person would have believed he or she was free to leave,"[17] and pertinently, that factors which suggest a seizure has occurred and that a suspect is in custody include the threatening presence of several officers; the display of a weapon by an officer; the physical touching of the suspect; and the use of tone of voice or language that would indicate that compliance with the officer's request would be compelled.[18]  Thus, as considered by the trial

---

[16] 312 S.W.3d at 358 (citing *Baker v. Commonwealth*, 5 S.W.3d 142, 145 (Ky. 1999)).

[17] *Id.*

[18] *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Citing *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998), *Smith, id.* at 358-59, also notes that

> [o]ther factors which have been used to determine custody for *Miranda* purposes include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so, whether the suspect possessed unrestrained freedom of movement during questioning, and whether the suspect initiated contact with the police or voluntarily admitted the officers into the residence and acquiesced to their requests to answer some questions.

9

court, an officer's show of physical force is only one factor in the determination of whether a defendant was in custody at the time of the interrogation.[19]

While the trial court explained that an officer's show of physical force is only one factor for consideration in the custody analysis, Stalcup essentially argues that in his case, when analyzed properly, that factor should be given the most weight. Stalcup cites *Howes* for the premise that the custody analysis does not have a handshake and apology exception after an officer's show of force.

*Howes* lists relevant factors for determining how a suspect would have "gauged his freedom of movement," such as the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.[20] *Howes*, like *Smith*, expresses the long recognized principle that courts must examine "all the circumstances surrounding the interrogation."[21] In contrast to Stalcup's framing, "exceptions" are not part of the analysis. Indeed, within its totality of the circumstances analysis, *Howes* explained that circumstances of that case indicative of custody were "offset by others."[22] Thus, as to whether Stalcup was in custody at the time of the interview, when considering the totality of the circumstances, the trial court

---

[19] *See id.* at 358.

[20] *Id.* at 509.

[21] *Id.*

[22] *Id.* at 515.

10

considered the officer's show of force, the officer's subsequent interaction with Stalcup, as well as the other pre-interview circumstances, such as: Stalcup agreed to the interview, Stalcup accepted a ride with an officer because he had been drinking, Stalcup was not restrained, and Detective Norman informed Stalcup prior to the interview that he was free to leave, and that he was not under arrest.

Furthermore, the trial court considered that the interview lasted over three hours and that during the first hour the atmosphere of the interview was casual. During this portion of the interview, Stalcup relayed his version of how Judy was shot, claiming it was suicide. Detective Norman's tone was relaxed and non-confrontational. However, when Stalcup mentioned that he was scared, Detective Norman read Stalcup his *Miranda* rights.

The second hour of the interview, following the *Miranda* warning, was more confrontational. After Stalcup admitted to shooting the victim but claimed it was an accident, Detective Norman questioned Stalcup about inconsistencies between his version of the events and evidence. After Detective Norman called Stalcup a liar, Sheriff Carter entered the room and joined the interview. Considering the established facts of the questioning, like the trial court, we conclude that Stalcup was not in custody until Detective Norman gave the *Miranda* warning. Up until that point, a reasonable person in Stalcup's position would feel free to terminate the interview and leave.

As noted above, the second part of Stalcup's argument is that his statements should have been suppressed because the detectives used the

11

"question first" technique to circumvent *Miranda,* a technique which *Seibert*[23] found to be impermissible. Because this argument is unpreserved, Stalcup requests palpable error review.

In *Seibert,* the United States Supreme Court addressed whether a police protocol for custodial interrogation violated *Miranda.*[24] The protocol is described as a two-stage interrogation: "At any point during the pre-*Miranda* interrogation, usually after arrestees have confessed, officers . . . read the *Miranda* warnings and ask for a waiver. If the arrestees waive their *Miranda* rights, officers will be able to repeat any *subsequent* incriminating statements later in court."[25] "Although [the pre-*Miranda*] statement is generally inadmissible, since taken in violation of *Miranda v. Arizona,* the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time."[26] *Seibert* concluded that as the technique was used in that case to circumvent the suspect's *Miranda* rights, the "question first" technique was invalid and the post-*Miranda* repeated statements were not admissible.[27] Pertinently, in contrast to this case, all of the *Seibert* defendant's statements were taken during a custodial interrogation. Although uncited by Stalcup, *Peacher v. Commonwealth,*[28] is precedent which establishes that

---

[23] 542 U.S. 600.

[24] *Id.* at 604.

[25] *Id.* at 609-10 (citations omitted).

[26] *Id.* at 604 (internal citation omitted).

[27] *Id.* at 616-17.

[28] 391 S.W.3d 821, 849 (Ky. 2013).

12

Stalcup does not have a viable argument for suppression of his statements under *Seibert.*

In *Peacher,* like in this case, the Court first addressed whether the defendant was in custody prior to being advised of his *Miranda* rights.[29] The Court agreed with the trial court that the defendant was not in custody until the fourth interview segment and at that time, the defendant was properly advised of his rights.[30] The Court next addressed the defendant's argument that he was subjected to the "question first, then *Mirandize* " technique.[31] The Court explained that it was not possible for the defendant's case to run afoul of *Seibert;*[32] that is, unlike the *Seibert* defendant who was in custody from the beginning of the interview, the Court had concluded that the defendant was not in custody prior to being *Mirandized.* Like in *Peacher,* with our conclusion that Stalcup's questioning prior to being read his *Miranda* rights was non-custodial, *Seibert* is inapposite to Stalcup's case and cannot afford relief.

## **CONCLUSION**

For the foregoing reasons, we affirm the McCracken Circuit Court's order partially granting the suppression motion, and therefore affirm its judgment and sentence.

All sitting. All concur.

---

[29] *Id.* at 846-49.

[30] *Id.* at 846, 849.

[31] *Id.* at 849.

[32] *Id.*

COUNSEL FOR APPELLANT:

Travis Bewley
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General